IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 110,318

JOHN DOE,
*Appellee*,

v.

KIRK THOMPSON, DIRECTOR OF THE KANSAS
BUREAU OF INVESTIGATION, and FRANK DENNING,
JOHNSON COUNTY, KANSAS, SHERIFF,
*Appellants*.

SYLLABUS BY THE COURT

1.

Kansas' statutes governing judicial notice, K.S.A. 60-409 *et seq.*, apply to all facts, regardless of whether a particular fact may be labeled an adjudicative fact or a legislative fact.

2.

Although anonymous or pseudonymous litigation is an atypical procedure, it should be permitted where an important privacy interest outweighs the public interest in the litigant's identity.

3.

Article I, § 10 of the United States Constitution provides that no state shall pass any ex post facto law. Ex post facto laws include retroactively applied legislation that make more burdensome the punishment for a crime, after its commission.

4.

The constitutional prohibition on ex post facto laws applies only to penal statutes.

5.

To determine whether the retroactive application of a statutory scheme violates the Ex Post Facto Clause, a court first determines the legislature's intention. If a statutory scheme was intended to be punitive, it cannot be applied retroactively under any circumstances.

6.

If the legislature intended to enact a regulatory scheme that is civil and nonpunitive, the next inquiry is whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intent to deem it civil. If a statutory scheme is punitive in effect, the Ex Post Facto Clause prohibits its application retroactively.

7.

The Kansas Offender Registration Act, K.S.A. 22-4901 *et seq.,* as amended in 2011, is punitive in effect, and the amended statutory scheme cannot be applied retroactively to any sex offender who committed the qualifying crime prior to July 1, 2011.

Appeal from Shawnee District Court; LARRY D. HENDRICKS, judge. Opinion filed April 22, 2016. Affirmed.

*Christopher M. Grunewald*, assistant attorney general, argued the cause, and *Ward E. Loyd*, assistant attorney general, and *Derek Schmidt*, attorney general, were with him on the briefs for appellant Kirk Thompson, and *Kirk T. Ridgway*, of Ferree, Bunn, Rundberg, Radom & Ridgway, Chartered, of Overland Park, was with him on the briefs for appellant Frank Denning.

*Christopher M. Joseph*, of Joseph Hollander & Craft, LLC, of Topeka, argued the cause, and *Carrie E. Parker*, of the same firm, was with him on the brief for appellee.

*James R. Shetlar*, of Overland Park, was on the brief for *amicus curiae* The National Center for Victims of Crime.

*Jessica R. Kunen*, of Lawrence, was on the brief for *amicus curiae* American Civil Liberties Union Foundation of Kansas.

The opinion of the court was delivered by

JOHNSON, J.:  Plaintiff, proceeding under the pseudonym John Doe, filed a declaratory judgment action against agents of the State, claiming that retroactive application of the 2011 amendments to the Kansas Offender Registration Act, K.S.A. 22-4901 *et seq.* (KORA), violated the Ex Post Facto Clause of Article I, § 10 of the United States Constitution (hereafter, Ex Post Facto Clause). The district court granted summary judgment in Doe's favor, finding that while the legislature intended KORA to be a civil statutory scheme, the act was punitive in effect pursuant to the factors identified in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963) (*Mendoza-Martinez* factors). Consequently, the district court concluded that, because KORA's retroactive application assigned a new punitive measure to a crime already consummated, it violated the Ex Post Facto Clause.

The State appealed the district court's judgment, arguing that the district court erred by (1) refusing to strike inadmissible evidence submitted in support of Doe's motion for summary judgment; (2) taking judicial notice of certain journal articles; and (3) concluding that the KORA amendments violated the Ex Post Facto Clause. In addition, the State complains about the district court's order granting Doe leave to proceed with a pseudonym. We affirm the district court's result.

FACTUAL AND PROCEDURAL OVERVIEW

In 2003, after being charged with inappropriately touching or fondling a 14- or 15-year-old child, Doe pled guilty to and was convicted of one count of indecent liberties with a minor, in violation of K.S.A. 21-3503(a)(1) (Furse 1995). In April 2003, he received a controlling prison term of 32 months, but the prison portion of his sentence was suspended and he was placed on probation for 36 months. It appears that probation was Doe's presumptive sentence. Doe successfully completed his probation in April 2006.

At the time of his conviction, KORA required Doe to register with both the Kansas Bureau of Investigation (KBI) and the Johnson County Sheriff's Office for a period of 10 years from the date of his conviction, given that he was not incarcerated. K.S.A. 2002 Supp. 22-4906(a). Doe submitted his initial registration forms following his April 2003 sentencing and thereafter complied with the KORA registration and reporting requirements.

Information from the registration form, such as the offender's name, age, address, gender, race, and photograph, is available for public access on the Johnson County Sheriff's website, which allows the public to search for offenders by name or geographical location. In addition, the website contains a "share and bookmark" feature that allows users to share registry information via email and other Internet information sharing resources.

The KBI's website provides even more information for public access, including such additional information as the offender's hair and eye color, the dates of offense and conviction, the county of conviction, and the age of the victim. It also allows the public to search for an offender by name and geographical location. The public can also learn if a

4

phone number, email, or Facebook identity belongs to an offender. Finally, the KBI website provides a community notification system that allows an individual to be notified by email when a registered offender registers a home, work, or school address that is near an address of interest to the notified individual.

Before Doe was scheduled to complete his reporting requirements, on June 15, 2011, the KBI sent a letter to all registered offenders, including Doe, detailing recent legislative amendments to KORA that were to become effective on July 1, 2011. The letter advised Doe that the amendments were retroactive and would apply to all offenders regardless of when their underlying offenses occurred. Particularly germane to Doe was the notification that his period of registration had been extended from 10 years to 25 years after conviction, *i.e.*, Doe's KORA completion date was changed from the year 2013 to the year 2028.

In response, Doe filed a petition for declaratory judgment against KBI director Kirk Thompson and Johnson County Sheriff Frank Denning (hereafter collectively referred to as "the State"). Doe sought a judicial determination that the retroactive application of the 2011 KORA amendments, particularly the extension of the registration period, violated the Ex Post Facto Clause by effecting an after-the-fact increase in punishment for a previously committed crime. Doe sought, and was granted, leave to proceed with his lawsuit using a pseudonym in order to protect his identity, his family members' identities, and the identity of the victim in the underlying criminal case.

Both parties filed motions for summary judgment. To his motion, Doe attached affidavits and journal articles. The affidavits described how the registration requirements had adversely impacted Doe and his family. The journal articles provided general discussions of the difficulties that sex offenders encounter due to the registration requirements, together with social science findings regarding the impact that registration

5

laws have on recidivism. The State filed a motion to strike specific portions of the affidavits, claiming that they were "replete with testimony unsupported by specific material facts or personal knowledge or both; inadmissible hearsay testimony"; and contained lay opinion testimony that lacked proper foundation. In addition, the State contended that Doe's motion for summary judgment "inappropriately attempts to use general law journal articles and other publications in lieu of testimony to establish certain facts."

The district court denied the defendants' motion to strike and granted Doe's motion for summary judgment. As will be discussed in more detail below, the district court found that the 2011 amendments to KORA imposed additional burdens upon KORA registrants so as to render the act punitive in effect. Specifically, the district court concluded that "KORA's current provisions subject Mr. Doe to punishment under any definition," and, therefore, the retroactive application of those punitive provisions to a previously committed crime violated the Ex Post Facto Clause. The district court entered judgment requiring defendants to immediately terminate Doe's additional 15-year registration requirement and delete all KORA information that was being publicly displayed.

The State filed a timely appeal, invoking this court's jurisdiction pursuant to K.S.A. 60-2101(b), which provides that "[a]n appeal from a final judgment of a district court in any civil action in which a statute of this state or of the United States has been held unconstitutional shall be taken directly to the supreme court."

DENIAL OF STATE'S MOTION TO STRIKE MATERIAL
FROM PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The State argues that the district court erred in failing to strike certain evidence that Doe submitted in support of his motion for summary judgment. Specifically, the State complains about: (1) testimony contained in the affidavits that was not based on

6

personal knowledge; (2) inadmissible hearsay evidence contained within the affidavits; and (3) purported "legislative facts" contained in journal articles, which forms the basis of the second issue discussed below. The State contends that the error was unfairly prejudicial because several of the objectionable affidavit statements "were recited by the district court as uncontroverted material facts." Doe claims that the State's argument is a "straw man," because the statements were not relied upon by the district court in deciding the summary judgment motion.

*Standard of Review*

The State challenges the legal basis upon which the district court considered the affidavits and journal articles in conjunction with Doe's summary judgment motion. We exercise de novo review over a challenge to the legal adequacy of the district court's decision to admit or exclude evidence. See *State v. Holman*, 295 Kan. 116, Syl. ¶ 6, 284 P.3d 251 (2012).

To the extent that we are called upon to interpret our judicial notice statute, K.S.A. 60-409, we conduct a de novo review. See *Jeanes v. Bank of America*, 296 Kan. 870, 873, 295 P.3d 1045 (2013) (statutory interpretation a legal question subject to de novo review).

*Analysis*

We begin with the State's challenges to the affidavits of John Doe and his wife, Jane Doe. K.S.A. 2012 Supp. 60-256(e)(1), the statutory provision governing motions for summary judgment, contains a specific provision addressing affidavits or declarations that are submitted in support of, or opposition to, a summary judgment motion, to-wit:

7

"A supporting or opposing affidavit or declaration must be made on personal knowledge, set out facts that would be admissible in evidence and show that the affiant or declarant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit or declaration, a sworn or certified copy must be attached to or served with the affidavit or declaration. The court may permit an affidavit or declaration to be supplemented or opposed by depositions, answers to interrogatories or additional affidavits or declarations."

Affidavits submitted in support of, or in opposition to, a summary judgment motion must set forth evidence in a form that would be admissible at trial. *Estate of Belden v. Brown County*, 46 Kan. App. 2d 247, 285-86, 261 P.3d 943 (2011). Moreover, Kansas Supreme Court Rule 141(d) (2014 Kan. Ct. R. Annot. 258) provides that a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

Although the State's motion to strike objected to 33 of the 44 paragraphs contained in Doe's affidavit and 15 of the 19 paragraphs contained in Jane Doe's affidavit, the State's brief in this appeal narrowed the focus of their objections to 12 paragraphs in Doe's affidavit and 6 paragraphs in Jane Doe's affidavit. The challenged paragraphs deal generally with how the registration has impacted the Does' children, Doe's employment and housing, Doe's access to school activities, and Doe's access to a hospital visitation.

With respect to the Does' children, the affidavits stated that other parents had instructed their children not to associate with the Doe family; that the Doe children had been teased at school and had come home crying because their classmates had called Doe a "bad man," a "pervert," or a "pedophile"; that the children were only repeating what they heard their parents say; and that the parents knew nothing about Doe except what could be reviewed on the offender registry. The State complains that the Does were not personally present to hear what the other children had said or what they had heard from

8

their parents, and that the Does could not personally know whether the other children's parents had accessed the registry or had obtained their knowledge from some other source.

The State's assertion that the affiants lacked personal knowledge has some merit with respect to the speculation about what the schoolmates' parents told them or that the parents obtained their knowledge of Doe by accessing the registry. But the Does observed first-hand the trauma their children had experienced and personally heard the children explain that the source of that mental anguish was teasing and name-calling by their schoolmates. To the extent the State is arguing hearsay, K.S.A. 2012 Supp. 60-460(l) recognizes an exception for statements of physical or mental condition, including the declarant's existing state of mind or emotion, when the mental condition is in issue or is relevant to prove or explain the acts or conduct of the declarant. See *State v. Hobson*, 234 Kan. 133, 154, 671 P.2d 1365 (1983). The Doe children's statements about what their schoolmates said and did was certainly relevant to explain why they came home from school crying.

With respect to his employment, Doe's affidavit stated that he had continued to work for a corporation throughout his prosecution and even after his conviction, but that he "was terminated once [his] presence on the Offender Registry was brought to the attention of [his] employer." Doe asserted that someone had told his manager that he was listed as a sex offender, whereupon the manager terminated Doe and had him escorted from the building. Doe related that the manager had said that other employees working for the company had felony convictions, but that Doe's listing on the registry would expose the company to public relations liabilities and issues related to employees' concerns for workplace safety.

Doe also testified about his attempts to find employment commensurate with his education, skills, and abilities. He said prospective employers always rejected him as soon as he disclosed his registration status. Some even told him to come back when he was "off the list."

The State's brief makes the somewhat confusing argument that Doe had "provided no basis to testify to the truth about [his] former manager's thoughts about Doe's registration status," for example, that there were corporate concerns about liabilities or that a coworker had found Doe on the registry and told the former manager. But, of course, Doe's basis for testifying about what his former manager said was that the manager was saying those things directly to Doe, while firing him. Moreover, whether the manager was being totally truthful in all that he said to Doe is not really the point. Rather, what is germane is that the manager told Doe that he was fired because his name was on the registry.

Again, although not argued by the parties, it appears that the manager's statement can be admitted under K.S.A. 2012 Supp. 60-460(l) to explain the manager's state-of-mind, *i.e.*, the reason he undertook the action at issue, even if it cannot be used to prove that Doe was actually listed on the registry or that there was actually a corporate concern about liabilities. See *Monroe v. Board of Ed. of Town of Wolcott, Connecticut*, 65 F.R.D. 641, 649 (D. Conn. 1975) (school principal's affidavit recitation based on what he heard the school board say were reasons for expelling a student fit hearsay exception for declarations of present existing motive or reason for action).

Perhaps Doe might have obtained an affidavit directly from the manager and avoided the State's hearsay challenge. But we recently opined that "[a] statement contemporaneously describing a declarant's belief or intention is inherently more trustworthy than a statement made after the fact, when incentives to embellish or

10

fabricate may have arisen." *State v. Cosby*, 293 Kan. 121, 131, 262 P.3d 285 (2011). Moreover, even if the manager's statement of the reason for firing Doe was not admissible, it would be reasonable to infer that the reason was the registry, given the timing and abruptness of the termination.

With respect to housing, Doe's affidavit described his attempts to rent a place to live. Even though his rental applications reflected prior military service, an excellent credit history, and sufficient income to support the monthly rent, landlords repeatedly refused to rent to Doe. The landlords related to Doe that they had no problem with the registration per se but that the map on the website showing where sex offenders live was a problem because it would cause current tenants to leave and potential tenants to avoid the area.

In its brief, the State makes no separate argument as to why this statement should be struck, other than to refer back to its comprehensive presentation to the district court, which included tables specifying specific objections to each paragraph. But Doe could certainly testify that, after he began disclosing that he was listed on the sex offender registry, he was repeatedly denied housing. Then it would be a reasonable inference to draw that a website map showing the location of registered sex offenders would be an impediment to a registrant obtaining an apartment.

The only other affidavit paragraph that drew a specific argument from the State on appeal concerned Doe being denied admittance to visit neighbors at a hospital. The affidavit related that at the entrance, a security guard swiped Doe's driver's license but then advised him that the hospital could not accommodate his visit and that he had to leave. The affidavit added the declaration: "I was only barred from entering because I was listed on the Offender Registry, not because of my crime." The State argues that "Doe's testimony about the truth of whether a hospital barred his entry solely because of

11

his registration status and not his crime is not founded on personal knowledge of the hospital's policies or instructions to its guards."

The State's concern about whether the guard's actions were based upon hospital policy or instructions misses the point. As will be discussed later, Doe's status as a registrant was identified on his driver's license. Doe could certainly testify that he attempted to enter the hospital, but when he presented his sex offender driver's license, he was denied admittance. The district court could consider that testimony and infer that admittance was denied based upon the registry identification on the swiped license.

Nevertheless, to the extent the affidavits contain inadmissible evidence, a remand to the district court is unnecessary. The principal issue before us is whether the district court's summary grant of plaintiff's declaratory judgment was erroneous, as a matter of law. Accordingly, we will conduct a de novo review and can disregard any information that was improperly contained within the affidavits.

*Judicial Notice of Journal Articles*

The State next complains that the district court twice erred in its handling of the 16 journal articles attached as appendices to Doe's motion for summary judgment. First, it contends that the district court was wrong in ruling that the Kansas judicial notice statute does not apply to "legislative facts." Then, the district court compounded the error by actually taking judicial notice of the journal articles to support its determination that KORA violates ex post facto.

While Doe did not cite to the articles in his statement of uncontroverted facts, he used them to supply the factual premise for some of his legal arguments. For example, Doe referenced the journal articles to support his arguments that offender registration and

12

notification requirements create adverse collateral consequences for registered sex offenders, *e.g.*, that registered sex offenders face employment difficulties, challenges to obtain housing, and social stigmatization. He cited to other journal articles in support of the argument that such difficulties can increase a sex offender's recidivism rate; that the offense-based tier system of determining registration lengths was not reasonably related to the danger of recidivism; and that "[c]ontemporary studies overwhelmingly indicate that registration and notification laws do not reduce sex crime recidivism rates."

*Standard of Review*

The resolution of this issue will depend on the applicability of our judicial notice statute, K.S.A. 60-409. That presents a question of law subject to de novo review. *Jeanes*, 296 Kan. at 873.

*Analysis*

The State's motion to strike the journal articles asserted that Doe was inappropriately using the law journal articles and other publications as a substitute for the competent and admissible testimony needed to establish the material facts upon which his arguments relied. The State also argued that Doe's legal argument impermissibly relied on contentions of fact not contained in his statement of uncontroverted facts, in violation of Kansas Supreme Court Rule 141(a)(1). In response, Doe argued that the journal articles were not offered to prove adjudicative facts, but instead were relevant to establish legislative facts, to which the rules of evidence do not apply.

In denying the State's motion to strike, the district court concluded that the journal articles containing results of social science research studies were admissible as legislative facts. Accordingly, the district court opined that "[b]ecause the studies are legislative facts, the judicial notice statutes do not apply, and the Court may take judicial notice of

13

the studies when ruling on the parties' summary judgment motions." In its memorandum decision and order, the district court placed some reliance upon the social science research contained within certain journal articles.

On appeal, the State argues that Kansas' judicial notice statute, unlike federal law, makes no distinction between adjudicative and legislative facts, and that judicial notice of the social science evidence relied upon by the district court was not statutorily authorized. In addition, the State contends that the journal articles did not contain legislative facts; that the articles did not support the definitive conclusions reached by the district court; and that Doe was required to have an expert witness to authenticate, explain, validate, or adopt the conclusions upon which the district court relied. Doe counters that the journal articles do constitute legislative facts to which K.S.A. 60-409 is inapplicable and that both the United States Supreme Court and the Kansas Supreme Court have been taking judicial notice of legislative facts for years without any regard to evidentiary rules, such as evidence admissibility. Nevertheless, Doe suggests that we can hold that the 2011 amendments to KORA are punitive, in violation of the Ex Post Facto Clause, without relying on the legislative facts at issue here.

Doe's argument that appellate courts have selectively used "legislative facts" to support a holding is not entirely without merit. For instance, in *Smith v. Doe*, 538 U.S. 84, 103, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003), which will be discussed in detail below, the United States Supreme Court refers to "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class." The high Court even labels the risk of recidivism posed by sex offenders as "'frightening and high.'" 538 U.S. at 103 (quoting *McKune v. Lile*, 536 U.S. 24, 34, 122 S. Ct. 2017, 153 L. Ed. 2d 47 [2002]). It gives one pause to think that the "legislative facts" frequently used to justify sex offender registration laws might not be completely accurate, if Doe's journal

14

articles are to be believed. Nevertheless, the question here is whether our judicial notice statute applied to Doe's appended journal articles, and we find that it does.

K.S.A. 60-409 specifically lists the type of facts that must or may be judicially noticed. For example, the statute provides that judicial notice *shall* be taken of common law, constitutions, and public statutes, as well as "specific facts and propositions of generalized knowledge as are so universally known that they cannot reasonably be the subject of dispute." K.S.A. 60-409(a). In addition, the statute provides that judicial notice *may* be taken of "such facts as are so generally known or of such common notoriety within the territorial jurisdiction of the court that they cannot reasonably be the subject of dispute," and "specific facts and propositions of generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy." K.S.A. 60-409(b)(3) and (4).

A major impediment to Doe's argument is the statutory language. Unlike the federal rule of evidence, K.S.A. 60-409 does not explicitly limit its application to "adjudicative facts." *Cf.* Fed. R. Evid. 201(a) ("This rule governs judicial notice of an adjudicative fact only, not a legislative fact."). Ordinarily, "[w]hen a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words." *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 725, 317 P.3d 70 (2014).

Perhaps more importantly, our statute appears to govern the types of facts which would fall within the category of "legislative facts." For example, K.S.A. 60-409(a) specifically provides that judicial notice *shall* be taken of laws, constitutions, and statutes. In contrast, the language of Fed. R. Evid. 201 does not mention statutes, laws, or regulations because the federal provision expressly excludes legislative facts, and

15

"[s]tatutes are considered legislative facts" of which the authority of courts to take judicial notice is "unquestionable." *United States v. Williams*, 442 F.3d 1259, 1261 (10th Cir. 2006). Additionally, K.S.A. 60-409(a) provides that judicial notice shall be taken of "specific facts and propositions of *generalized knowledge* as are so universally known that they cannot reasonably be the subject of dispute." (Emphasis added.) This, too, appears to be encompassed by the definition of "legislative facts." See *United States v. Gould*, 536 F.2d 216, 220 (8th Cir. 1976) (defining legislative facts as "established truths, facts or pronouncements that do not change from case to case but apply universally").

Accordingly, even if the district court was correct in determining that the information in the journal articles constituted legislative facts, it nevertheless erred in finding that K.S.A. 60-409 did not apply. If a Kansas court is to take judicial notice of a fact—either adjudicative or legislative—it must do so in conformity with our judicial notice statutes.

Here, it appears that if the journal articles reporting social science findings fall within any statutory category it would be the provision for "specific facts and propositions of generalized knowledge which are capable of immediate and accurate determination by resort to easily accessible sources of indisputable accuracy." K.S.A. 60-409(b)(4); see also K.S.A. 60-410 (provisions relating to determination as to propriety of taking judicial notice). But the district court found K.S.A. 60-409(b) inapplicable, and, consequently, it did not consider whether the articles upon which it relied were "sources of indisputable accuracy."

The State contends that the articles are not indisputably accurate because the subjects of recidivism and the measure of the benefits of public notification laws generally are not closed subjects. Instead, the State argues, the submitted articles are simply "recent scholarship on a debated subject." We agree. While it does appear that

16

there is an evolution of knowledge and opinion taking place with respect to sex offender recidivism and the effects of public notification laws, the articles appended by Doe to his summary judgment motion could not be deemed to be the definitive final word on the topic, *i.e.*, were not sources of indisputable accuracy.

But, again, we need not remand to the district court. We can simply conduct our de novo review without reference to the appended articles.

USE OF A PSEUDONYM

Before proceeding to the principal issue before us, we pause briefly to address the State's complaint that the district court should not have permitted Doe to proceed under a pseudonym.

*Standard of Review*

Both parties agree that an abuse of discretion standard of review applies when considering a district court's decision to allow an action to proceed anonymously. See *Unwitting Victim v. C.S.*, 273 Kan. 937, 944, 47 P.3d 392 (2002). Our familiar abuse of discretion standard is stated as follows:

> "'Judicial discretion is abused if judicial action (1) is arbitrary, fanciful, or unreasonable, *i.e.*, if no reasonable person would have taken the view adopted by the trial court; (2) is based on an error of law, *i.e.*, if the discretion is guided by an erroneous legal conclusion; or (3) is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based.' *State v. Ward*, 292 Kan. 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)." *State v. Nelson*, 296 Kan. 692, 694, 294 P.3d 323 (2013).

17

*Analysis*

This court has expressly held that "[a]lthough anonymous or pseudonymous litigation is an atypical procedure, where an important privacy interest outweighs the public interest in the identity of the plaintiff, the plaintiff should be allowed to proceed anonymously." *Unwitting Victim*, 273 Kan. at 944. The *Unwitting Victim* court balanced the plaintiff's claimed right to privacy against the public interest militating against pseudonymity, utilizing nine factors:  (1) The extent to which the identity of the litigant has been kept confidential; (2) the bases upon which disclosure is feared or sought to be avoided and the substantiality of these bases; (3) the magnitude of public interest in maintaining the confidentiality of the litigant's identity; (4) whether, because of the purely legal nature of the issues presented or otherwise, there is an atypically weak public interest in knowing the litigant's identities; (5) the undesirability of an outcome adverse to the pseudonymous party and attributable to his or her refusal to pursue the case at the price of being publicly identified; (6) whether the party seeking to sue pseudonymously has illegitimate ulterior motives; (7) the universal level of public interest in access to the identities of the litigants; (8) whether the litigant is a public figure; and (9) whether opposition to the pseudonym is illegitimately motivated. 273 Kan. at 947-48.

As the State acknowledges, the district court utilized the nine factors to conduct a balancing test, comparing the public's interests versus Doe's privacy rights. In other words, the district court used the correct legal standard.

The State does not point us to any place in the district court's careful consideration of the factors where the judge was arbitrary, fanciful, or unreasonable. We have carefully reviewed the court's rulings on each of the factors and cannot discern anything that was arbitrary, fanciful, or unreasonable. The State has failed to establish that no reasonable person would have taken the view adopted by the trial court. To the contrary, the State

18

has offered no rational explanation as to why the public's safety would be better protected by disclosing the identity of an individual challenging KORA on purely legal grounds as essentially a class representative. Rather, its complaint appears to be simply that the court did not assess the evidence in a manner that would yield the State's desired result. This was not a case of an abuse of discretion, but rather the exercise of learned discretion.

Finally, the State's challenges to the sufficiency of the evidence are unavailing. The district court had evidence to support its findings. We decline the State's implicit invitation to reweigh that evidence.

In short, the district court did not abuse its discretion when it permitted Doe to proceed pseudonymously.

EX POST FACTO CLAUSE VIOLATION

The State's substantive issue is whether the 2011 amendments to KORA can be retroactively applied to Doe without violating the Ex Post Facto Clause. The State contends that, even though Doe committed his crime before the 2011 amendments, the Ex Post Facto Clause is simply inapplicable because the amended KORA is still a regulatory scheme that is civil and nonpunitive. Our resolution will hinge on whether the 2011 amendments rendered the KORA statutory scheme so punitive in effect as to negate any implied intent to make it "civil." See *Smith*, 538 U.S. at 92 (citing *Kansas v. Hendricks*, 521 U.S. 346, 361, 117 S. Ct. 2072, 138 L. Ed. 2d 501 [1997]). We find that they do.

But before proceeding, we pause to clarify what we are not deciding today. We are not saying that the 2011 version of KORA is unconstitutional as applied to any sex offender who commits a covered crime on or after its July 1, 2011, effective date.

19

Although we are finding that the KORA statutory scheme is now penal in nature, the legislature is permitted to impose penal sanctions on future violators. We are saying that the legislature cannot add today's new sanction to a punishment imposed yesterday. The only sex offenders affected by this decision are those that have been complying with the Kansas registration requirements in effect when they committed their offenses. And this decision does not relieve any registrant from completing the registration requirements in effect when he or she committed the applicable offense. Further, this opinion will have no effect on any offender's obligations under federal law.

Likewise, as emphasized in *State v. Myers*, 260 Kan. 669, 700, 923 P.2d 1024 (1996), *cert. denied* 521 U.S. 1118 (1997), "we are not balancing the rights of . . . sex offenders against the rights of . . . their victims." Rather, our duty is to resolve "a claim of constitutional infringement arising from retroactive legislation." 260 Kan. at 700. The Constitution does not exclude sex offenders from its protections.

*Standard of Review*

"When the application of a statute is challenged on constitutional grounds, this court exercises an unlimited, de novo standard of review. *State v. Myers*, 260 Kan. 669, 676, 923 P.2d 1024 (1996)." *State v. Cook*, 286 Kan. 766, 768, 187 P.3d 1283 (2008).

*Analysis*

*Ex Post Facto Clause*

The constitutional protection in issue here is found in Article I, § 10, which simply states, in relevant part, that "[n]o State shall . . . pass any . . . ex post facto Law." "We have held that a law is ex post facto if two critical elements are present:  (1) The law is retrospective, and (2) the law disadvantages the offender affected by it." *State v. Gleason*,

20

299 Kan. 1127, 1159-60, 329 P.3d 1102 (2014) (citing *State v. Jaben*, 294 Kan. 607, 612, 277 P.3d 417 [2012]; *State v. Cook*, 286 Kan. 766, 770, 187 P.3d 1283 [2008]).

Recently, this court clarified that "retroactively applied legislation that simply 'alters the situation of a party to his disadvantage' does not, in and of itself, violate the Ex Post Facto Clause. The disadvantage, to be unconstitutional under the Clause, must fall within one of the categories recognized in *Beazell* [*v. Ohio*, 269 U.S. 167, 169-70, 46 S. Ct. 68, 70 L. Ed. 216 (1925)]." *State v. Todd*, 299 Kan. 263, 277, 323 P.3d 829 (2014). The *Beazell* category that is applicable here is "'"[a]ny statute . . . which makes more burdensome the punishment for a crime, after its commission."'" *Todd*, 299 Kan. at 277 (quoting *Beazell*, 269 U.S. at 169-70); see also *Gleason*, 299 Kan. at 1159-60. Doe claims, and the district court found, that the 2011 amendments to KORA made the punishment for Doe's 2001-2002 crimes more burdensome.

But "[t]he constitutional prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them." *Myers*, 260 Kan. at 677. The State contends that KORA is not punishment for the sex offender's crime, but rather a civil regulatory scheme enacted for the purpose of public safety.

State v. Myers

Kansas first considered whether a sex offender registration law ran afoul of the Ex Post Facto Clause in *Myers*, which was filed in 1996. *Myers* related the relatively brief history of Kansas' law, beginning in 1993 with the Habitual Sex Offender Registration Act (HSORA), which required repeat offenders to register for 10 years. Registration consisted of a statement in writing that included the offender's name, date of birth, social security number, fingerprints, and a photograph, as well as information on the offense(s) committed and the dates/location of conviction(s). K.S.A. 1993 Supp. 22-4907. But

21

HSORA, specifically K.S.A 1993 Supp. 22-4909, said that the registration information "shall not be open to inspection by the public" or subject to the Kansas Open Records Act, and that the data could only be obtained by a law enforcement officer or other person specifically authorized by law.

The following year, the act was amended and renamed the Kansas Sex Offender Registration Act (KSORA) because it included first-time offenders, who were subject to the 10-year registration term. Second or subsequent offenses resulted in lifetime registration. KSORA also allowed for public inspection of registration information at the sheriff's office and specifically made the registration information subject to the Open Records Act. L. 1994, ch. 107, secs. 1-7.

Myers had committed his offense prior to the effective date of KSORA. Consequently, Myers claimed that the retroactive application of KSORA's reporting and disclosure requirements violated the Ex Post Facto Clause. The State conceded that KSORA was being retroactively applied to Myers but argued that the intent and purpose of KSORA was regulatory, rather than punitive. The *Myers* court agreed with the State, holding that while KSORA contained no express statement of legislative intent or purpose, "the legislative history suggests a nonpunitive purpose—public safety." 260 Kan. at 681.

But *Myers* recognized that its analysis did not end with its "public safety" conclusion. Rather, it had to determine "whether the 'statutory scheme was so punitive either in purpose or effect as to negate that intention.' *United States v. Ward*, 448 U.S. 242, 248-49, 65 L. Ed. 2d 742, 100 S. Ct. 2636 (1980)." 260 Kan. at 681. Ultimately, *Myers* determined that the registration component of KSORA was remedial but that the public disclosure provisions of the act were too punitive in effect to withstand constitutional scrutiny. Specifically, the *Myers* court held:

"For Myers, KSORA's disclosure provision must be considered punishment. We hold that the legislative aim in the disclosure provision was not to punish and that retribution was not an intended purpose. However, we reason that the repercussions, despite how they may be justified, are great enough under the facts of this case to be considered punishment. The unrestricted public access given to the sex offender registry is excessive and goes beyond that necessary to promote public safety." 260 Kan. at 699.

Enroute to that holding, *Myers* found that the practical effect of KSORA's unrestricted dissemination of registration information "could make it impossible for the offender to find housing or employment" and that "[u]nrestricted public access to the registered information leaves open the possibility that the registered offender will be subjected to public stigma and ostracism." 260 Kan. at 696. Then, the court opined that "[t]o avoid the ex post facto characterization, public access [to registration information] should be limited to those with a need to know the information for public safety purposes" and that those authorized to access the information should only use it for public safety purposes. 260 Kan. at 700.

The State urges us to accept *Myers*' holding as being equally applicable to the registration component of KORA, but to find that *Myers*' holding on the public disclosure component was effectively overruled by the United States Supreme Court's decision in *Smith*.

Smith v. Doe

In *Smith*, the United States Supreme Court held that retroactive application of the Alaska Sex Offender Registration Act (ASORA) did not violate the Ex Post Facto Clause. 538 U.S. at 105-06. *Smith* was the first time the Court had considered this type of claim; however, the Court applied its well-established framework of (1) determining whether the legislature's intention was to enact a "a regulatory scheme that is civil and

23

nonpunitive" and, if so, (2) "examin[ing] whether the statutory scheme is "'so punitive either in purpose or effect as to negate [the State's] intention" to deem it "civil.""" 538 U.S. at 92 (quoting *Hendricks*, 521 U.S. at 361). This framework is often referred to as the "intent-effects" test. See, *e.g.*, *Moore v. Avoyelles Correctional Center*, 253 F.3d 870, 872 (5th Cir. 2001).

Under the intent portion of the test, "[w]hether a statutory scheme is civil or criminal 'is first of all a question of statutory construction.'" *Smith*, 538 U.S. at 92 (quoting *Hendricks*, 521 U.S. at 361). If the legislature intended to punish, the ex post facto violation is established and no inquiry into the effects of the act is required. 538 U.S. at 92-93.

The first inquiry under intent is whether "'the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.'" *Smith*, 538 U.S. at 93 (quoting *Hudson v. United States*, 522 U.S. 93, 99, 118 S. Ct. 488, 139 L. Ed. 2d 450 [1997]). The Court relied upon the Alaska Legislature's express statutory finding that "'sex offenders pose a high risk of reoffending' and identified 'protecting the public from sex offenders' as the 'primary governmental interest' of the law." *Smith*, 538 U.S. at 93 (quoting 1994 Alaska Sess. Laws, ch. 41, § 1). Citing to its earlier decision in *Hendricks*, the Court reiterated that "an imposition of restrictive measures on sex offenders adjudged to be dangerous is 'a legitimate nonpunitive governmental objective and has been historically so regarded.'" *Smith*, 538 U.S. at 93 (quoting *Hendricks*, 521 U.S. at 363).

*Smith* held that the stated nonpunitive intent of the ASORA was not altered by the Alaska Constitution's inclusion of protecting public safety as a purpose for the criminal justice system, by the legislature's partial codification of the ASORA in the criminal procedure code, or by the requirement for courts accepting criminal pleas and entering

criminal judgments to inform defendants of the ASORA requirements. 538 U.S. at 93-96. The Court noted that its conclusion was "strengthened by the fact that, aside from the duty to register, the statute itself mandates no procedures[,]" but "[i]nstead . . . vests the authority to promulgate implementing regulations with the Alaska Department of Public Safety, . . . an agency charged with the enforcement of both criminal *and* civil regulatory laws." 538 U.S. at 96. Therefore, the Court held that the Alaska Legislature's intent "was to create a civil, nonpunitive regime." 538 U.S. at 96.

After concluding that the intent of the Alaska Legislature was nonpunitive, the Court turned to the effects of the ASORA. 538 U.S. at 97. The Court held that "[b]ecause we 'ordinarily defer to the legislature's stated intent,' [citation omitted] '"only the clearest proof" will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.'" *Smith*, 538 U.S. at 92 (quoting *Hudson*, 522 U.S. at 100). The Court utilized the factors identified in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 83 S. Ct. 544, 9 L. Ed. 2d 644 (1963), but noted that "[b]ecause the *Mendoza-Martinez* factors are designed to apply in various constitutional contexts . . . they are 'neither exhaustive nor dispositive,' [citations omitted] but are 'useful guideposts.' [Citation omitted.]" 538 U.S. at 97. The Court explained:

> "The factors most relevant to our analysis are whether, in its necessary operation, the regulatory scheme:  [1] has been regarded in our history and traditions as a punishment; [2] imposes an affirmative disability or restraint; [3] promotes the traditional aims of punishment; [4] has a rational connection to a nonpunitive purpose; or [5] is excessive with respect to this purpose." *Smith*, 538 U.S. at 97.

*Smith* summarily dismissed the remaining two *Mendoza-Martinez* factors—"whether the regulation comes into play only on a finding of scienter and whether the behavior to which it applies is already a crime"—by declaring those factors carried "little weight." 538 U.S. at 105.

Under the first factor, whether the "regulatory scheme . . . has been regarded in our history and traditions as a punishment," the Court reasoned that "[a] historical survey can be useful because a State that decides to punish an individual is likely to select a means deemed punitive in our tradition, so that the public will recognize it as such." 538 U.S. at 97. The Court noted that sex offender registration and notification statutes "'are of fairly recent origin,' which suggests that the statute was not meant as a punitive measure, or, at least, that it did not involve a traditional means of punishing." 538 U.S. at 97 (quoting *Doe I v. Otte*, 259 F.3d 979, 989 [9th Cir. 2001]).

The *Smith* Court rejected the respondents' argument that ASORA, and particularly its notification provisions, "resemble shaming punishments of the colonial period." 538 U.S. at 97-98. The Court recognized that "[s]ome colonial punishments indeed were meant to inflict public disgrace"; however, unlike the ASORA, the colonial punishments had a corporal element, involved direct confrontation between the public and the offender, or expelled the offender from the community. 538 U.S. at 97-98. The Court held that the stigma from the ASORA "result[ed] not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public." 538 U.S. at 98. The Court was not swayed by the fact that Alaska posted registration information on the Internet, concluding that a member of the public visiting the State's website was analogous to the person visiting the official criminal records archive. 538 U.S. at 99.

In analyzing the second factor, whether "the regulatory scheme . . . imposes an affirmative disability or restraint," the Court considered "how the effects of the Act are felt by those subject to it. If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." 538 U.S. at 97, 99-100. The Court noted that unlike prison, "the paradigmatic affirmative disability or restraint," the act did not impose physical restraint. 538 U.S. at 100. Further, the Court held the act less burdensome than occupational

26

disbarment, which is nonpunitive. 538 U.S. at 100. Additionally, the Court rejected sex offenders' employment and housing difficulties as conjecture unsupported by evidence. 538 U.S. at 100. The Court recognized the potential "lasting and painful impact on the convicted sex offender"; however, the court held "these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record." 538 U.S. at 101.

The Court also noted that the Ninth Circuit, which had held ASORA constituted punishment, incorrectly believed that ASORA required sex offenders to update registration in person. 538 U.S. at 101. Additionally, the Court rejected the Ninth Circuit's conclusion that registration was "parallel to probation or supervised release in terms of the restraint imposed" because while the "argument has some force," unlike registration, "[p]robation and supervised release entail a series of mandatory conditions and allow the supervising officer to seek the revocation of probation or release in case of infraction." 538 U.S. at 101. Although noting that offenders "must inform the authorities after they change their facial features (such as growing a beard), borrow a car, or seek psychiatric treatment, they are not required to seek permission to do so." 538 U.S. at 101. The Court reasoned that although a sex offender may be prosecuted for a registration violation, such prosecution is separate from the individual's original offense. 538 U.S. at 102.

The third factor involves whether the "regulatory scheme . . . promotes the traditional aims of punishment." *Smith*, 538 U.S. at 97. The Supreme Court has described those aims as retribution and deterrence. See, *e.g.*, *Mendoza-Martinez*, 372 U.S. at 168. The Court held that although the ASORA might deter future crimes "[a]ny number of governmental programs might deter crime without imposing punishment" and "'[t]o hold that the mere presence of a deterrent purpose renders such sanctions "criminal" . . . would severely undermine the Government's ability to engage in effective regulation.'" *Smith*,

27

538 U.S. at 102 (quoting *Hudson*, 522 U.S. at 105). The Court held that the act's registration obligations were not retributive based upon the differing duration of reporting for different categories of offenders because these measures were "reasonably related to the danger of recidivism, and this is consistent with the regulatory objective." 538 U.S. at 102.

The Court found that the fourth factor, a rational connection to a nonpunitive purpose, was the most significant factor in its "determination that the statute's effects are not punitive." 538 U.S. at 102. In *Smith*, the respondents agreed that ASORA's nonpunitive purpose of alerting "'the public to the risk of sex offenders in their communit[y]'" was "valid, and rational." 538 U.S. at 103 (quoting *Otte*, 259 F.3d at 991). However, the Court summarily rejected the respondent's argument that ASORA was not "'narrowly drawn to accomplish the stated purpose,'" reasoning that a "statute is not deemed punitive simply because it lacks a close or perfect fit with the nonpunitive aims it seeks to advance." 538 U.S. at 103.

When assessing the fifth factor, whether the regulatory scheme is excessive with respect to its purpose, the Court opined it need not determine "whether the legislature has made the best choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 105. The Court concluded that ASORA's application to all convicted sex offenders, without any individualized assessment of the offender's dangerousness, did not render the act punitive. Finding that the risk of recidivism by sex offenders was "'frightening and high,'" the Court held that "[i]n the context of the regulatory scheme the State can dispense with individual predictions of future dangerousness and allow the public to assess the risk on the basis of accurate, nonprivate information about the registrants' convictions without violating the prohibitions of the *Ex Post Facto* Clause." 538 U.S. at 103-04.

28

Relying on empirical research on child molesters, the Court also held that the duration of ASORA's reporting requirements was not excessive because "'most reoffenses do not occur within the first several years after release,' but may occur 'as late as 20 years following release.'" 538 U.S. at 104 (quoting National Institute of Justice, R. Prentky, R. Knight, & A. Lee, U.S. Dept. of Justice, Child Sexual Molestation: Research Issues 14 [1997]).

Finally, the Court held that the widespread dissemination of the registration information was not excessive, instead finding that the "notification system is a passive one: An individual must seek access to the information." 538 U.S. at 105. The Court also determined that making the registry information available throughout the state was not excessive in light of population mobility, citing to a study indicating that 38% of recidivist sex offenses took place in different jurisdictions than where the previous offense was committed. 538 U.S. at 105.

Having determined that the respondents had failed to show "that the effects of the law negate Alaska's intention to establish a civil regulatory scheme," the *Smith* majority declared that the act was nonpunitive and that its retroactive application did not violate the Ex Post Facto Clause. 538 U.S. at 105-06.

In stark contrast, the Alaska Supreme Court would later use the same intent-effects test that the *Smith* Court utilized but would find that ASORA violated the Ex Post Facto Clause of the Alaska state constitution, concluding:

> "Because ASORA compels (under threat of conviction) intrusive affirmative conduct, because this conduct is equivalent to that required by criminal judgments, because ASORA makes the disclosed information public and requires its broad dissemination without limitation, because ASORA applies only to those convicted of crime, and because ASORA neither meaningfully distinguishes between classes of sex

29

offenses on the basis of risk nor gives offenders any opportunity to demonstrate their lack of risk, ASORA's effects are punitive. We therefore conclude that the statute violates Alaska's ex post facto clause." *Doe v. State*, 189 P.3d 999, 1019 (Alaska 2008).

Interestingly, the Alaska court cited with approval to *Myers*. *Doe*, 189 P.3d at 1017. Other states have likewise relied on their state constitutions to prohibit retroactive application of sex offender registration statutes. See *Wallace v. State*, 905 N.E.2d 371, 377-78 (Ind. 2009); *Doe v. Dept. of Public Safety and Correctional Services*, 430 Md. 535, 547-48, 62 A.3d 123 (2013); *State v. Williams*, 129 Ohio St. 3d 344, 347-49, 952 N.E.2d 1108 (2011); *Starkey v. Oklahoma Dept. of Corrections*, 2013 OK 43, ¶ 76-79, 305 P.3d 1004 (2013). But, Kansas does not have a specific Ex Post Facto Clause in our state constitution. *Todd*, 299 Kan. at 276.

And this court is bound by the United States Supreme Court's interpretation of the United States Constitution, albeit we are not bound by any lower federal court. See *Lockhart v. Fretwell*, 506 U.S. 364, 376, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993) (Thomas, J., concurring) ("The Supremacy Clause demands that state law yield to federal law, but neither federal supremacy nor any other principle of federal law requires that a state court's interpretation of federal law give way to a (lower) federal court's interpretation. In our federal system, a state trial court's interpretation of federal law is no less authoritative than that of the federal court of appeals in whose circuit the trial court is located."). Accordingly, our inquiry becomes whether KORA, as amended in 2011, is sufficiently distinct from ASORA reviewed in *Smith* that it mandates a different result under the federal Constitution.

*Application of Intent-Effects Test to KORA, as Amended in 2011*

In the initial step of the intent-effects test, the statutory provisions are construed to determine whether the legislature intended to enact a punitive provision. If so, retroactive

application of the provisions is always prohibited; no further inquiry is needed. *Smith* found ASORA nonpunitive, first pointing to express statutory language, stating that the objective of the law was to protect the public from sex offenders and that the release of certain information to the public assists in protecting the public safety. 538 U.S. at 93. *Smith* also noted that Alaska's statutory scheme placed the notification provisions in the health, safety, and housing code, albeit the registration provisions were codified in the criminal procedure code. Moreover, the Alaska statute mandated no procedures but rather it vested the Alaska Department of Public Safety with authority to promulgate implementing regulations, leading the *Smith* Court to infer that "the legislature envisioned the Act's implementation to be civil and administrative." 538 U.S. at 96.

KORA, in contrast, is wholly contained within our criminal procedure code, mandates the manner of implementation, and imposes serious criminal sanctions for noncompliance. As *State v. Myers*, 260 Kan. 669, 678, 923 P.2d 1024 (1996), pointed out, Kansas' act "contains no express statement of legislative intent or purpose." Curiously, our sex offender act has been amended numerous times since *Myers* noted the absence of a legislative expression of intent or purpose while finding the notification provisions punitive in effect. See L. 1997, ch. 181, secs. 7-14; L. 1999, ch. 164, secs. 29-34, 36; L. 2000, ch. 150, sec. 2; L. 2001, ch. 208, secs. 10-16; L. 2002, ch. 163, sec. 6; L. 2002, ch. 55, secs. 1-4; L. 2003, ch. 123, secs. 3-9; L. 2005, ch. 202, secs. 1-2; L. 2006, ch. 212, sec. 20; L. 2006, ch. 214, sec. 2, 6-10; L. 2007, ch. 181, secs. 1-7; L. 2008, ch. 57, sec. 1; L. 2008, ch. 74, sec. 1; L. 2009, ch. 32, sec. 44; L. 2010, ch. 66, sec. 1; L. 2010, ch. 74, sec. 11; L. 2010, ch. 135, secs. 35-37; L. 2010, ch. 147, sec. 8; L. 2010, ch. 155, sec. 10; L. 2011, ch. 95, secs. 1-11; L. 2012, ch. 149, secs. 1-10; L. 2013, ch. 127, secs. 1-8; and L. 2014, ch. 117, secs. 2-3. Nevertheless, the legislature has yet to definitively express the intent or purpose of the act.

Notwithstanding that KORA is more fully clothed in criminality than was *Smith*'s ASORA, we need not ruminate on how the high court would judge the Kansas Legislature's intent or purpose. We have our own precedent; *Myers* found a nonpunitive purpose of public safety in the legislative history of KSORA. Doe points us to no subsequent legislative history that would lead us to overturn *Myers*' holding on the intent portion of the analysis. Accordingly, we proceed to consider how the factual distinctions between the statute under examination in *Smith* and that under examination today affect the "effects" portion of the test.

We begin with a list of the most significant differences between the 2011 version of KORA and the version of ASORA reviewed in *Smith*:

- *KORA applies to a broader group of offenders.*
  The 2011 KORA applies to sex offenders, violent offenders, and drug offenders (with no personal use exception). K.S.A. 2011 Supp. 22-4902. ASORA only applied to sex offenders and child kidnappers. Alaska Stat. § 12.63.010 (2000).

- *KORA requires frequent in-person reporting regardless of registration changes.*
  KORA requires in-person quarterly reporting for sex offenders in each location where the offender resides, maintains employment, or attends school. K.S.A. 2011 Supp. 22-4905(b). Additionally, transient offenders must register in person in the location where the offender is physically present every 30 days. K.S.A. 2011 Supp. 22-4905(e). ASORA did not require in-person reporting after initial registration. Alaska required annual written verification for nonaggravated sex offenses and quarterly written verification for aggravated offenses. Alaska Stat. § 12.63.010(d) (2000).

- *KORA often requires longer registration terms.*

  For the majority of first-time sex offenses, KORA requires 25 years or lifetime registration.  K.S.A. 2011 Supp. 22-4906. For first-time nonaggravated sex offenses, the ASORA required 15-year registration.  Alaska Stat. § 12.63.020 (2000).

- *KORA requires additional registration information.*

  In addition to the registration information offenders were required to provide under ASORA, KORA registration requires:  alias dates or places of birth; temporary lodging information; telephone numbers; social security number; occupation; name of any anticipated employer and anticipated place of employment; photocopies of current driver's licenses and identification cards; aircraft and watercraft license plates and registration information; information concerning where motor vehicles, aircraft, and watercraft are habitually parked or otherwise kept; professional licenses, designations, and certifications; preconviction mental health treatment; schools attended or expected to be attended; travel and immigration documents; name and telephone number of probation, parole, or community corrections officer; email addresses; all online identities used on the Internet; any information relating to membership in online social networks; DNA exemplars; and the sex and date of birth of each victim. Compare K.S.A. 2011 Supp. 22-4907 with Alaska Stat. § 12.63.10 (2000).

- *KORA requires in-person registration updates.*

  KORA additionally requires in-person registration updates within 3 days of *any* information change. K.S.A. 2011 Supp. 22-4905(g). ASORA required a written update for a change of residence. Alaska Stat. § 12.63.010(c) (2000).

33

- *KORA requires additional information dissemination to the public.*
  In addition to the information made available to the public under ASORA, KORA disseminates:  any other offenses for which the offender has been convicted or adjudicated; temporary lodging information; address of any place where the offender will be a student; and professional licenses, designations, and certifications the offender holds. K.S.A. 2011 Supp. 22-4909(b)(3), (5), (8), and (10); Alaska Stat. § 18.65.087 (2000).

- *KORA imposes costly registration fees*.
  KORA requires that offenders remit a $20 fee, four times per year, in each location where an offender resides, maintains employment, or attends school. K.S.A. 2011 Supp. 22-4905(k). ASORA allowed the department of public safety to adopt fees for registration and required that fees be based upon actual costs and be set at a level not to discourage registration. Alaska Stat. § 18.65.087(d)(3) (2000).

- *KORA requires provision of notice for travel outside the United States*.
  Under KORA, an offender must give 21 days' notice of international travel except in emergency situations. K.S.A. 2011 Supp. 22-4905(o). No restriction on travel was included in ASORA.

- *KORA requires annual driver's license and identification card renewal and the Motor Vehicle Drivers' License Act requires a distinguishing number on the KORA registrant's driver's licenses.*
  K.S.A. 2011 Supp. 22-4905(l); K.S.A. 2014 Supp. 8-243(d). ASORA did not contain similar requirements.

34

- *Kansas considers whether a parent is subject to KORA or is residing with a person subject to KORA in determining child custody, residency, and parenting time.*

  K.S.A. 2011 Supp. 23-3203(h), (j). Alaska's domestic relations code did not require consideration of registered offender status. See Alaska Stat. §§ 25.20.090 (2000); 25.24.150 (2000).

- *KORA imposes burdensome penalties for violations.*

  Under the 2011 KORA, a first conviction is a severity level 6 person felony, a second conviction is a severity level 5 person felony, a third conviction is a severity level 3 person felony, and a violation continuing for more than 180 days is a severity level 3 person felony. K.S.A. 2011 Supp. 22-4903. Under ASORA, the penalty for a first-time failure to register was a class A misdemeanor. Alaska Stat. § 11.56.840 (2000). The penalty for a second time failure to register or failure to register with the intent to escape detection or identification and to facilitate the person's commission of a sex offense or child kidnapping was a class C felony, the lowest severity level felony in Alaska. Alaska Stat. § 11.56.835 (2000); Alaska Stat. § 11.81.250 (2000).

The district court found these differences significant, opining that, since *Smith*, the requirements in Kansas had become "increasingly severe." Further, the district court noted that the advent of the widespread use of social media had significantly changed the landscape for dissemination of offender information. The court then individually discussed four of the *Mendoza-Martinez* factors.

Following the *Smith* format, we will likewise individually discuss the guideline factors from *Mendoza-Martinez*, although it is important to keep in mind that it is the entire "statutory scheme" that must be examined for its punitive effect. See *Smith*, 538

U.S. at 92 (effects analysis requires the appellate court to "examine . . . the *statutory scheme*" [emphasis added]); *Myers*, 260 Kan. at 681 (quoting *United States v. Ward*, 448 U.S. 242, 248-49, 100 S. Ct. 2636, 65 L. Ed. 2d 742 [1980]) ("ask whether the '*statutory scheme* was so punitive either in purpose or effect'" [emphasis added]). For instance, a particular registration requirement may not have the same punitive effect in a statutory scheme that permits a reduction in registration time for proven rehabilitation, as it does in a statutory scheme that precludes any individualized modifications.

The first factor considered by *Smith* was whether the regulatory scheme has been regarded in our history and traditions as a punishment. 538 U.S. at 97. Again, the *Smith* Court rejected the argument that ASORA's notification provisions "resemble shaming punishments of the colonial period," finding that such early punishments as shaming, humiliation, and banishment involved more than the dissemination of information. 538 U.S. at 97. Then, notwithstanding that the focus was supposed to be upon the "effects" of the law, rather than the legislative intent, *Smith* rationalized that Alaska did not "make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme." 538 U.S. at 99. Nevertheless, the 2011 KORA crosses the line drawn by *Smith*.

*Myers* cited to *Artway v. Attorney General of State of N.J.*, 81 F.3d 1235, 1265 (3d Cir. 1996), for a quotation from Nathaniel Hawthorne, *The Scarlet Letter*, 63-64 (Random House 1950) (1850), which, referring to the portion of Hester Prynne's punishment for adultery that required her to wear a scarlet "A" upon her dress, stated: "'There can be no outrage . . . against our common nature,—whatever be the delinquencies of the individual,—no outrage more flagrant than to forbid the culprit to hide his face for shame; as it was the essence of this punishment to do.'" KORA mimics that shaming of old by branding the driver's license of a registrant with the designation, "RO." See K.S.A. 2014 Supp. 8-243(d). While a driver's license is not worn upon a person's chest, it is required to be displayed for a variety of reasons unrelated to KORA's

36

public safety purpose, *e.g.*, to obtain medical treatment, to obtain a checking account balance from a bank teller, to vote in Kansas, etc. See also *Starkey v. Oklahoma Dept. of Corrections*, 2013 OK 43, ¶ 59, 305 P.3d 1004 (2013) ("driver's license is frequently necessary in face-to-face encounters when cashing a check, using a credit card, applying for credit, obtaining a job, entering some public buildings, and in air travel . . . subject[ing] an offender to unnecessary public humiliation and shame . . . not unlike a 'scarlet letter.'"). Consequently, in the words of *Smith*, the statutory scheme "[holds] the person up before his fellow citizens for face-to-face shaming." 538 U.S. at 98. In the words of the district court, "the notation on the [driver's] license is a visible badge of past criminality in line with traditional punishment."

Likewise, *Smith*'s description of Alaska's posting of registration information on the Internet as a passive system, akin to physically visiting "an official archive of criminal records," 538 U.S. at 99, is antiquated in today's world of pushed notifications to listservs and indiscriminate social media sharing. The Supreme Court has recently recognized the vast amount of data that is currently available to most citizens on their smartphones and that "a cell phone [can be] used to access data located elsewhere, at the tap of a screen." *Riley v. California*, 573 U.S. ___, 134 S. Ct. 2473, 2491, 189 L. Ed. 2d 430 (2014). Indeed, *Myers*' fear that "[t]he print or broadcast media could make it a practice of publishing the list [of sex offenders] as often as they chose," 260 Kan. at 697, has come to pass. Websites contain pop-up ads offering to locate sex offenders for the viewer. Indeed, one would not be surprised to find that an application (app) for a mobile device had been developed that would provide instant access to the location of all sex offenders in a given location. And, as the district court noted, members of the public may now post public comments about an offender after using the Johnson County "share and bookmark" feature that posts registry information on social media sites such as Facebook, Twitter, and Myspace. In contrast, *Smith*'s analysis of ASORA specifically noted the absence of the ability of the public to comment.  538 U.S. at 99. The district court

37

therefore concluded that "citizens can use the county-sponsored website to create a virtual forum for public shaming, which closely resembles traditional punishment." We agree.

Any suggestion that disseminating sex offender registration on an Internet website reaches no more members of the public and is no more burdensome to the offender than maintaining an archived criminal record simply ignores the reality of today's world. Moreover, the argument that the additional widespread dissemination enhances the effectiveness of the registration system simply misses the point; the focus of this part of the intent-effects test is to assess whether there is a penal effect on the offender. For example, placing the offender in a locked stockade on the courthouse square would more effectively achieve the purpose of public safety, but, of course, the effect of that method could not be labeled nonpunishment.

On the registration side of the statutory scheme, KORA utilizes a traditional means of punishment when it requires quarterly registration in person in each location where the offender works, lives, or attends school. Reporting in person to a State agent, up to 12 times a year, to update the agent on the offender's personal, employment, and educational status replicates what we most often see when the criminal sanction of probation or parole is imposed.

The next *Mendoza-Martinez* factor—whether the statutory scheme subjects the offender to an affirmative disability or restraint—involves an inquiry into "how the effects of the Act are felt by those subject to it." 538 U.S. at 99-100. *Smith* noted that ASORA imposed no physical restraint on offenders, and, although registrants had to inform the authorities of certain changes, such as a job or residence, the offenders were not required to obtain prior permission for the change. Of course, in Kansas, KORA requires 21 days' prior notification for international travel.

But the more common restraint on an offender's freedom of movement under KORA is more indirect. The offender must register in person quarterly in each applicable jurisdiction and remit $20 to each jurisdiction each time, at the risk of committing a new felony under K.S.A. 2011 Supp. 22-4903. As the district court noted, that will result in the offender paying from $80 to $240 a year. Further, KORA's definition of "reside" is extremely broad. K.S.A. 2011 Supp. 22-4902(j) provides that "[i]t shall be presumed that an offender resides at any and all locations where the offender stays, sleeps or maintains the offender's person for seven or more consecutive days or parts of days, or for seven or more non-consecutive days in a period of 30 consecutive days." Under those rules, an offender could inadvertently acquire a new registration residence by taking a week's vacation out-of-county, or by having a sales route where the offender stays in an out-of-county motel for 2 nights a week, *i.e.*, 8 nonconsecutive days in a period of 30 consecutive days. As the district court opined, "in-person, quarterly reporting restricts offenders' time and freedom" and is akin to the punitive measure of probation or parole, as we have discussed above.

The district court also found that KORA registration and notification created housing and occupational barriers for an offender. *Smith* rejected as "conjecture" the argument that registration under ASORA had created employment or housing problems in that case, declaring that "these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record." 538 U.S. at 100-01. But here, the State's argument that Doe's employment and housing barriers were constructed by his conviction, rather than by his registration, is not supported by the evidence.

Granted, the district court relied on social science research gleaned from the journal articles for such information as the pervasiveness of employment difficulties associated with registration. But the district court also had direct testimony in this case

39

from Doe himself, stating that he retained his job through the time of his prosecution and conviction, only to be fired after his registration became public. Moreover, Doe's listing on the registry was the reason given for both his job termination and his inability to get a better job. Likewise, the published map showing the residential location of sex offenders was the reason given by prospective landlords for refusing to rent to Doe.

To say Doe's housing and employment problems flowed from the public record of his conviction, rather than from the notification provisions of KORA, defies logic and common sense. First, one would have to question how many members of the general public are proficient at accessing and interpreting archived court records. Next, those records would not identify the offender's place of employment, so that a public relations reaction to the corporate employer would be a remote possibility, whereas the offender is tied to the employer in the registry. Likewise, the criminal defendant's address at the time of conviction, even if contained within the public portion of the court records, would not necessarily be the same as when the record was accessed. Moreover, although a defendant on probation must notify the defendant's probation officer of a change of address, that information is not open to the public. Certainly, potential landlords would have no concern that other tenants would ascertain the offender's current address from the prior court record. That information would have to come from KORA.

Blaming the public record of conviction, rather than KORA registration and dissemination, for housing and employment difficulties also defies our precedent. *Myers* looked at the practical effect of unrestricted dissemination of registration information and concluded that it "could make it impossible for the offender to find housing or employment." 260 Kan. at 696. Certainly, the ensuing increase in the number of people with access to the Internet since *Myers*, along with the increased ease with which information can be shared and commented upon, only serves to corroborate that case's prescient holding.

40

Accordingly, we affirm the district court's determination that KORA's statutory scheme works an affirmative disability or restraint on the offender.

The next factor is whether the statutory scheme promotes the traditional aims of punishment: deterrence and retribution. *Smith* acknowledged the deterrent effect of the law but summarily considered that to be a necessary component of effective government regulation. *Smith* then rejected the lower court's conclusion that ASORA was retributive for basing the length of the reporting requirement on the extent of wrongdoing, rather than the risk posed by the offender. It concluded, without further explanation, that the broad categories and length of required reporting were "reasonably related to the danger of recidivism" and, thus, consistent with the regulatory objective. 538 U.S. at 102. But *cf. Com. v. Baker*, 295 S.W.3d 437, 444 (Ky. 2009) ("When a restriction is imposed equally upon all offenders, with no consideration given to how dangerous any particular registrant may be to public safety, that restriction begins to look far more like retribution for past offenses than a regulation intended to prevent future ones.").

If the 10-year length of reporting was reasonably related to the danger of recidivism in 2003, when Doe was convicted and the year after *Smith* was decided, one has to wonder what happened in 2011 to make the reasonable relationship two and a half times greater. The State has provided nothing to support the reasonableness of the 25-year reporting term. Even *Smith*'s "legislative fact" in support of ASORA's length of reporting was that sex offenders may reoffend "'as late as 20 years following release.'" 538 U.S. at 104. KORA's new reporting term is 25% longer than *Smith*'s outside limit. Moreover, Doe's "legislative fact" from current social science indicates that the risk of recidivism actually decreases as the offender ages. Even if we do not take judicial notice of that "legislative fact," we can conclude that there is no evidentiary or logical support for the increase in reporting term. Such arbitrariness is inherently retributive.

The next factor—which *Smith* labeled "a '[m]ost significant' factor"—is the act's rational connection to a nonpunitive purpose. *Smith* found ASORA rationally connected to the nonpunitive purpose of public safety, even though the act was not "'narrowly drawn to accomplish the stated purpose.'" 538 U.S. at 102-03. *Smith* would apparently require the imprecision to render the nonpunitive purpose a "'sham or mere pretext.'" 538 U.S. at 103 (quoting *Hendricks*, 521 U.S. at 371).

Arguably, under the current KORA, public safety has become a pretext. Without differentiating between the 18-year-old immature, marginally intelligent, sexually naïve person who succumbs to the seduction of a mature-acting, sexually informed 15-year-old child and the 30-year-old confirmed pedophile that rapes preschoolers and is not amenable to rehabilitation, KORA fails to effectively notify the public of the danger of recidivism. Too much is too little. Moreover, that flaw is accentuated by KORA's prohibition in K.S.A. 2011 Supp. 22-4908:  "No person required to register as an offender pursuant to the Kansas offender registration act shall be granted an order relieving the offender of further registration under the act." Even fully rehabilitated offenders will be on the registry for a quarter-century. In the words of the district court, "[w]ithout a mechanism for challenging long registration periods, offenders who are compliant with the registration requirements and have a low risk of recidivism suffer consequences that outweigh the minimal increases in public safety created by registration." *Cf. Gonzalez v. State*, 980 N.E.2d 312, 320-21 (Ind. 2013) (finding that Indiana's registration law was excessive in relation to its articulated purpose because the act contained no mechanism for determining whether offender had been rehabilitated or no longer presented a risk to the public thereby alleviating the need for registration).

On the flip side, the registry could be underinclusive because only *convicted* sex offenders must register. One who has engaged in the same conduct as Doe might well avoid being subjected to the rigors of registration by pleading to a non-sex offense, by

being acquitted because of a suppressed confession, or by having a conviction overturned on appeal because of an illegal search or some other reason, other than insufficient evidence. One can envision that a prosecutor might use offender registration as a plea bargaining chip to leverage a guilty plea to a charge that the prosecutor has amended from a KORA offense to a non-KORA offense, which would effectively nullify the public safety purpose of KORA. Again, the point is that the statutory scheme is not closely connected to the nonpunitive purpose of public safety.

The final factor is whether the statutory scheme is excessive in relation to its regulatory purpose. Our discussion of the other factors has touched upon the excessive nature of KORA, at least as amended in 2011. For instance, the information a registrant is required to provide has increased dramatically from that required in the *Myers* era, to include such items as the registration number of owned watercraft.

And the penalty for noncompliance with the stringent and complicated registration rules has been elevated to a level 6 person felony, as opposed to being a misdemeanor under the act reviewed in *Smith*. Granted, the countering argument is that the increased penalty is for committing a new crime. But the sex or other offense is a *necessary* predicate to any conviction for failing to comply with KORA, because only those who have been convicted of a qualifying offense are subject to the registration requirements. Moreover, when the penalty for failing to comply with registration exceeds the penalty for the crime triggering the registration requirement, the statutory scheme loses its civil regulatory blush.

*Smith* relied heavily on its "legislative facts" to justify ASORA's excessive provisions, which may or may not remain valid. But what we do know is that *Smith*'s reliance on the notification system being "passive," 538 U.S. at 105, does not translate to today's system under KORA. For instance, the KBI will provide active notification under

certain circumstances, and, as the district court correctly noted, "the current internet notification schemes are more aggressive than they were when *Smith* was decided, offenders are at a greater risk of suffering ostracism and even vigilante acts by members of the community." Again, *Myers* got it right with respect to the effects of unlimited public dissemination of registration information.

In finding that the current KORA's statutory scheme is so punitive in effect as to negate the implied legislative intent to deem it civil, we are not unaware of the fact that a number of federal Circuit Courts of Appeal have found the federal act, the Sex Offender Registration and Notification Act (SORNA), 42 U.S.C. § 16901 *et seq.* (2012), nonpunitive and appropriately applied retroactively. Those cases are not persuasive because of the differences between SORNA and KORA. For instance, SORNA differentiates between classes of offenders, whereas KORA is a one-size-fits-all scheme; KORA is not restricted to just sex offenders, whereas SORNA is; KORA has no mechanism for obtaining an early release from the registration requirement, whereas SORNA allows for a reduction in registration time for a clean record; KORA requires a special, annually renewed driver's license and child custody notification not found in SORNA; KORA requires more registration information than SORNA; KORA imposes a fee, whereas SORNA does not; and KORA has a broader definition of "resides" than SORNA. See 42 U.S.C. §§ 16911, 16914-16 (2012). In other words, looking at the statutory scheme as a whole, the effects of KORA are considerably more punitive than those of SORNA.

In short, we affirm the district court. KORA as amended in 2011 is punitive in effect, and the amended statutory scheme cannot be applied retroactively to any person who committed the qualifying sex offense crime prior to July 1, 2011.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

\* \* \*

BILES, J., concurring in part and dissenting in part:  I agree with the majority that our legislature intended for the Kansas Offender Registration Act (KORA) and its 2011 amendments to be a civil regulatory scheme for public safety that was nonpunitive. I also agree the proper retroactivity test boils down to whether the 2011 amendments that prompt the present controversy render KORA so punitive as applied to sex offenders as to negate that intent. See *Smith v. Doe*, 538 U.S. 84, 92, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003) (applying intent-effects test for federal Ex Post Facto Clause purposes). Our state constitution does not contain a similar provision or suggest a different analytical process. See *State v. Todd*, 299 Kan. 263, 276, 323 P.3d 829 (2014) (no Ex Post Facto Clause in Kansas Constitution).

But this just means we are being asked to answer a federal question, which logically suggests adhering to the federal law on this subject. My colleagues in the majority too easily disregard the substantial federal caselaw that yields a contrary result from the one reached today. This caselaw uniformly concludes that the federal Sex Offender Registration and Notification Act (SORNA), 42 U.S.C. § 16901 *et seq.* (2012), as well as offender registration laws from other states, are nonpunitive and may be applied retroactively without violating the federal Ex Post Facto Clause. This authority sets the path we must follow.

---

[1]**REPORTER'S NOTE:**  Senior Judge Malone was appointed to hear case No. 110,318 under the authority vested in the Supreme Court by K.S.A. 20-2616 to fill the vacancy on the court created by the appointment of Justice Nancy Moritz to the United States 10th Circuit Court of Appeals.

*Standard of review*

Our standard of review is well known when considering a challenge to a statute's constitutionality; yet its recitation in the majority opinion tellingly ignores critical components, namely: we always presume legislative enactments are constitutional and we resolve all doubts in favor of a statute's validity. *State v. Cheeks*, 298 Kan. 1, 4, 310 P.3d 346 (2013); *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 315, 255 P.3d 1186 (2011). This presumption of constitutionality emanates from the critical doctrine of separation of powers, which recognizes that courts are concerned only with the legislative power to enact statutes—not with the wisdom behind them. *Miller v. Johnson*, 295 Kan. 636, 646, 289 P.3d 1098 (2012).

We do not declare a statute unconstitutional unless it is clear beyond a reasonable doubt that the statute infringes on constitutionally protected rights. *State v. Carr*, 300 Kan. 1, 285, 331 P.3d 544 (2014) (quoting *State v. Brown*, 280 Kan. 898, 899, 127 P.3d 257 [2006]). And as the United States Supreme Court noted in *Smith*, "'only the clearest proof'" of punitive effect is sufficient to override the legislature's intent to create a civil regulation. *Smith*, 538 U.S. at 91 (quoting *Hudson v. United States*, 522 U.S. 93, 100, 118 S. Ct. 488, 139 L. Ed. 2d 450 [1997]); see also *United States v. Young*, 585 F.3d 199, 2005 (5th Cir. 2009) ("[Y]oung must present the 'clearest proof' that either the purpose or the effect of [SORNA] is in fact so punitive as to negate its civil intent. This he cannot do.").

The majority's analysis deviates from these principles by framing the question as an examination into whether differences between KORA and the Alaska statute the United States Supreme Court upheld in *Smith* "mandates a different result." Slip op. at 30. But viewing the controversy in this way ignores the presumption of constitutionality,

46

resourcefully casts off the numerous decisions cited below that have upheld various registration requirements against federal retroactivity challenges, and renders meaningless the "clearest proof" standard stated in *Smith*. The majority's stated reason for this approach is that federal circuit court opinions are not binding on state supreme courts, so the majority will not consider whether their holdings may inform our thinking. This smacks of simply being a means to a predetermined end.

*Discussion*

The Ex Post Facto Clause of the United States Constitution prohibits state and federal governments from retroactively imposing additional punishment for a criminal offense. U.S. Const. art. I, §§ 9-10. As noted, Kansas does not have a comparable constitutional dictate. See *Todd*, 299 Kan. at 276.

Federal appellate courts have unanimously held retroactive application of the federal offender registration requirements found in SORNA does not violate the Ex Post Facto Clause. *United States v. Brunner*, 726 F.3d 299, 303 (2d Cir. 2013); *United States v. Parks*, 698 F.3d 1, 5-6 (1st Cir. 2012); *United States v. Felts*, 674 F.3d 599, 606 (6th Cir. 2012); *United States v. Elkins*, 683 F.3d 1039, 1045 (9th Cir. 2012); *United States v. Leach*, 639 F.3d 769, 773 (7th Cir. 2011); *United States v. W.B.H.*, 664 F.3d 848, 860 (11th Cir. 2011); *United States v. Shenandoah*, 595 F.3d 151 (3d Cir.), *cert. denied* 560 U.S. 974 (2010), *abrogated on other grounds by Reynolds v. United States*, 535 U.S. ___, 132 S. Ct. 975, 181 L. Ed. 2d 935 (2012); *United States v. Gould*, 568 F.3d 459, 466 (4th Cir. 2009), *cert. denied* 559 U.S. 974 (2010); *Young*, 585 F.3d at 206 (noting that Young made no "effort to prove that the effect of SORNA is so punitive as to make it not a civil scheme, and any attempt to do so would have been futile"); *United States v. May*, 535 F.3d 912, 919-20 (8th Cir. 2008), *cert. denied* 556 U.S. 1258 (2009), *abrogated on other grounds by Reynolds*, 132 S. Ct. 975; *United States v. Hinckley*, 550 F.3d 926, 937-38

47

(10th Cir. 2008), *abrogated on other grounds by Reynolds*, 132 S. Ct. 975 (2012); see also *United States v. Under Seal*, 709 F.3d 257, 265 (4th Cir. 2013) (applying *Mendoza-Martinez* factors to hold SORNA was not cruel and unusual punishment as applied to a juvenile); *United States v. Stacey*, 570 Fed. Appx. 213, 216 (3d Cir. 2014) (holding ex post facto challenge to conviction for failing to register under SORNA foreclosed by *Shenandoah*); *United States v. Sampsell*, 541 Fed. Appx. 258, 260 (4th Cir. 2013) (holding ex post facto challenge to SORNA foreclosed by *Gould*).

In addition, federal circuit courts have upheld state sex offender registration laws against federal ex post facto challenges, even when those state laws contained provisions more expansive in scope and impact than either SORNA or the Alaska provisions addressed in *Smith*. See *Litmon v. Harris*, 768 F.3d 1237, 1242-43 (9th Cir. 2014) (upholding California requirement that offenders register in-person every 90 days); *American Civil Liberties Union of Nevada v. Masto*, 670 F.3d 1046, 1051, 1058 (9th Cir. 2012) (upholding Nevada law expanding category of individuals who must register, increasing time period offenders were subject to registration, adding in-person registration requirements, and expanding law enforcement obligations to notify specified entities that an offender resided nearby); *Doe v. Bredesen*, 507 F.3d 998, 1000 (6th Cir. 2007) (upholding Tennessee law requiring, among other things, extended lifetime registration and satellite-based monitoring with wearable GPS device); *Hatton v. Bonner*, 356 F.3d 955, 967 (9th Cir. 2004) (upholding California law containing several provisions different from the Alaska statute analyzed in *Smith*).

The majority disingenuously characterizes this unanimous body of caselaw as just the decisions of "a number of Federal Circuit Courts of Appeal," which it then discounts by noting the obvious, *i.e*., there are differences between the federal SORNA and our state's KORA. Slip op. at 44. And while it is true that none of the statutory schemes upheld by other courts are identical to KORA, there is substantial overlap, and so the

48

rationale from those decisions should apply with equal force here. I would not so quickly disdain this federal caselaw because it compellingly answers the real question presented: Are there convincing reasons to believe the United States Supreme Court would view KORA differently than it viewed the Alaska law in 2003 when it decided *Smith*? See *Litmon*, 768 F.3d at 1243 ("[T]here is no reason to believe that the addition of [the 90-day, in-person registration] requirement would have changed the outcome [in *Smith*]."). If the answer to that question is no, then this court must affirm.

To answer the question presented, we apply the two-step test from *Smith* to determine whether the 2011 KORA amendments constitute an additional form of punishment when applied to offenders required to comply with them because of convictions that occurred before the amendments were enacted. See *Smith*, 538 U.S. at 92. And as noted, the majority correctly concludes in the first step that the Kansas Legislature intended for its 2011 amendments to preserve KORA's status as a civil regulatory scheme. Slip op. at 32. After that, we move to the second step, where we must decide whether those 2011 amendments are "'"so punitive either in purpose or effect as to negate [the State's] intention" to deem [KORA] "civil."'" *Smith*, 538 U.S. at 92. This is where I depart from the majority's analysis.

For this second step, we should follow the federal factors laid out in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963). See *Smith*, 538 U.S. at 97. Those factors consider the degree to which the regulatory scheme imposes a sanction that: (1) has historically been regarded as punishment; (2) constitutes an affirmative disability or restraint; (3) promotes the traditional aims of punishment; (4) is rationally connected to a nonpunitive purpose; (5) is excessive in relation to the identified nonpunitive purpose; (6) contains a sanction requiring a finding of scienter; and (7) applies the sanction to behavior that is already a crime. *Mendoza-Martinez*, 372 U.S. at 168. In *Smith*, the Court focused on the first five as more relevant in evaluating

49

Alaska's registration and notification law, concluding the remaining two were of "little weight." 538 U.S. at 105. I will do the same.

HISTORICAL FORM OF PUNISHMENT

The majority holds that the 2011 KORA "crosses the line drawn by *Smith*" by too closely resembling the shaming punishments from the colonial period. Slip op. at 36-37. KORA does this, according to the majority, by posting the registrant's information on the Internet, "branding" a registrant's driver's license with the letters "RO," and requiring quarterly registration in each location where an offender works, lives, or attends school. Let's take each of these in turn.

*Posting offender information on the Internet*

As summarized below, there is overwhelming federal authority holding that Internet posting of registrant information is not analogous to historical forms of punishment. The analysis used to reach that conclusion applies in equal force to KORA, regardless of other differences the statutory schemes may have. The majority overreaches by rejecting this caselaw and adopting a contrary view.

In *Smith*, the United States Supreme Court held that Alaska's offender registration act could apply retroactively and "[t]he fact that Alaska posts the information on the Internet does not alter our conclusion." 538 U.S. at 99. The Court held the posting requirement was not akin to historical punishments despite recognizing that it subjects the offender to public shame or humiliation because most of the information related to an already public criminal record and dissemination of it furthers a legitimate governmental objective. 538 U.S. at 99. The *Smith* Court explained:

50

"[T]he stigma of Alaska's Megan's Law results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record, most of which is already public. Our system does not treat dissemination of truthful information in furtherance of a legitimate governmental objective as punishment. On the contrary, our criminal law tradition insists on public indictment, public trial, and public imposition of sentence. Transparency is essential to maintaining public respect for the criminal justice system, ensuring its integrity, and protecting the rights of the accused. The publicity may cause adverse consequences for the convicted defendant, running from mild personal embarrassment to social ostracism. In contrast to the colonial shaming punishments, however, the State does not make the publicity and the resulting stigma an integral part of the objective of the regulatory scheme." 538 U.S. at 98-99.

The *Smith* Court then added:

"The fact that Alaska posts the information on the Internet does not alter our conclusion. It must be acknowledged that notice of a criminal conviction subjects the offender to public shame, the humiliation increasing in proportion to the extent of the publicity. And the geographic reach of the Internet is greater than anything which could have been designed in colonial times. These facts do not render Internet notification punitive. The purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender. Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation." 538 U.S. at 99.

In so holding, the Court's analysis recognizes the obvious—posting information on the Internet makes it far more accessible and subjects the offender to increased shame and humiliation. Nevertheless, the Court held that Internet posting did not make Alaska's statutory scheme punitive.

The majority characterizes the *Smith* Court's 2003 analysis of the Internet as "antiquated," and then concludes:  "Any suggestion that disseminating sex offender

51

registration [information] on an Internet website reaches no more members of the public and is no more burdensome to the offender than maintaining an archived criminal record simply ignores the reality of today's world." Slip op. at 38.

But as seen from its holding, *Smith* did not base its conclusion on some old-fashioned, dial-up modem/floppy disk notion of the World Wide Web; nor did it consider accessing offender information on the Internet nothing more than a walk to the courthouse to thumb through publicly available paper files. *Smith*'s rationale withstands the more recent development of a mobile, smartphone Internet. Indeed, these developments can be viewed as furthering the nonpunitive, public safety ends supporting offender registration because, as *Smith* acknowledged, "[w]idespread public access is necessary for the efficacy of the scheme." *Smith*, 538 U.S. at 99. The majority simply disagrees with the Court's conclusion but needs a rationale for considering the question further. This becomes overwhelmingly evident when the authority from more recent courts applying *Smith* is acknowledged.

Consider first the federal notification statute, SORNA. Similar to KORA, the federal law requires that offender information including the offenders' names, physical descriptions, photographs, criminal offenses, and criminal histories be made publicly available on the Internet. See 42 U.S.C. §§ 16914, 16918-16920 (2012). Under SORNA, the states and enumerated territories, including the District of Columbia and Puerto Rico, must each maintain websites for this purpose. See 42 U.S.C. §§ 16911(10); 16918(a) (2012). The federal government, in turn, must maintain a website containing "relevant information for each sex offender and other person listed on a jurisdiction's Internet site." 42 U.S.C. § 16920. Each of these websites must make the information obtainable "by a single query for any given zip code or geographic radius set by the user." 42 U.S.C. §§ 16918(a), 16920(b). And among SORNA's others mandates, an appropriate official must affirmatively distribute notice of an individual's sex offender status to "each school and

public housing agency" in the area where that sex offender resides. 42 U.S.C. § 16921(b)(2) (2012). In short, SORNA goes further than the Alaska scheme at issue in *Smith* and further than KORA as to affirmative notification of statutorily specified groups.

Nevertheless, all federal circuits addressing whether SORNA's publication requirements are punitive have followed *Smith* and held they are not, despite candidly recognizing they can result in greatly increased public shame. See, *e.g*., *Parks*, 698 F.3d at 5-6 (noting the disadvantages from the publicity attendant to SORNA's Internet requirements "are obvious" and refusing to invalidate SORNA due to "wide dissemination" of offender's information, citing *Smith*); *Hinckley*, 550 F.3d at 937-38 ("SORNA, just as the *Smith* scheme, merely provides for the 'dissemination of accurate information about a criminal record, most of which is already public'"); see also *United States v. Talada*, 631 F. Supp. 2d 797, 808 (S.D. W. Va. 2009) (citing *Smith* and upholding SORNA as a valid regulatory program even though it requires widespread Internet dissemination of offenders' information, a community notification program, and in-person reporting).

Also persuasive is the Ninth Circuit's 2012 decision upholding retroactive application of a Nevada statute that, among other things, not only required Internet publication of registration information, but also active notification to specified groups over and above what was required by SORNA, such as youth and religious organizations. *Masto*, 670 F.3d at 1051. In rejecting any notion that these features were akin to historical forms of punishment, the Ninth Circuit held:

> "Active dissemination of an individual's sex offender status does not alter the [*Smith*] Court's core reasoning that 'stigma . . . results not from public display for ridicule and shaming but from the dissemination of accurate information about a criminal record,

53

most of which is already public.' [Citation omitted.] Though 'humiliation increas[es] in proportion to the extent of the publicity,' the 'purpose and the principal effect of notification are to inform the public for its own safety.' [Citation omitted.]" 670 F.3d at 1056.

There is also recent state court authority, relying heavily on *Smith*, that holds posting registered offenders' information on the Internet is not akin to traditional shaming punishments. See *Kammerer v. State*, 322 P.3d 827, 834-36 (Wyo. 2014) ("Although dissemination of information relating to a registrant's status as a sex offender may have negative consequences for the registrant, information regarding the offense is made public at the time of trial, and its publication under WSORA is merely a necessary consequence of the Act's intent to protect the public from harm."); *State v. Letalien*, 2009 ME 130, ¶ 38, 985 A.2d 4 (2009) (Internet posting of sex offender information is not punitive in purpose or effect, citing *Smith*; Maine and federal Ex Post Facto Clauses are coextensive); see also *Doe I v. Williams*, 2013 ME 24, ¶ 35, 61 A.3d 718 (2013) (following *Letalien*).

I would follow this abundant caselaw and hold that KORA's Internet posting of information is not akin to historical shaming punishments. And in reaching that conclusion, I would further note the majority's discussion of the sharing functions available on the Johnson County Sherriff's website is irrelevant to the statute's constitutionality because KORA does not require this capability; and, just as importantly, the majority cites no authority that would find a federal ex post facto violation because of a nonstatutorily mandated software feature added by a local law enforcement agency.

Regardless, given the overwhelming weight and substance of the caselaw rejecting federal ex post facto challenges based on widespread Internet dissemination of offender registration information, as well as the federal courts' more recent validations of *Smith*, I

54

would not consider *Smith*'s rationale to be "antiquated" or subject to easy dismissal, and I would not weigh this against the statute's constitutionality. The majority errs in this regard.

*"Branding" a registrant's driver's license*

Next, the majority declares that KORA "mimics [the] shaming of old by branding the driver's license of a registrant with the designation, 'RO.'" Slip op. at 36. The majority is referring to K.S.A. 2011 Supp. 8-243, which provides that an offender's driver's license "shall be assigned a distinguishing number by the division [of motor vehicles] which will readily indicate to law enforcement officers that such person is a registered offender. The division shall develop a numbering system to implement the provisions of this subsection." This requirement, while not technically contained in KORA, differentiates Kansas laws from SORNA, although the statute only requires a distinguishing number and the "RO" practice is just a decision by a state agency that is not specifically dictated by the statute. See K.S.A. 2011 Supp. 8-243(d).

The majority draws support for its view from a divided decision in *Starkey v. Oklahoma Dept. of Corrections*, 2013 OK 43, 305 P.3d 1004 (2013), which considered the Oklahoma Constitution's Ex Post Facto Clause. See Okla. Const., art. 2, § 15. But I do not find *Starkey* persuasive for several reasons.

First, although the Oklahoma Supreme Court applied the intent-effects test, that court's majority suggests they applied a lower standard as to when the effects of a measure are punitive under the Oklahoma Ex Post Facto Clause by noting that the United States Constitution simply establishes a floor for constitutional rights in Oklahoma. 2013 OK 43, ¶ 45 ("How we apply the 'intent-effects' test is not governed by how the federal courts have independently applied the same test under the United States Constitution as

55

long as our interpretation is at least as protective as the federal interpretation."). Second, Oklahoma's offender registry law imposed harsher restraints on offenders because of residency boundaries (minimum distance from schools, playgrounds, etc.) and a requirement that Oklahoma driver's licenses and identification cards spell out the term "Sex Offender." In contrast, KORA contains no residency exclusions and Kansas simply uses as a matter of state agency practice an abbreviation (RO), which applies equally to non-sex-offenders. Finally, the *Starkey* court relied upon the totality of the Oklahoma law's harsher circumstances when determining they weighed in favor of punishment. 2013 OK 43, ¶ 61 ("[W]e are not making a determination of the constitutionality of any of these individual registration requirements but for purposes of analyzing the second *Mendoza-Martinez* factor we find the totality of these requirements weigh in favor of punishment.").

Offering a different analysis, the Louisiana Supreme Court's unanimous decision in *Smith v. State*, 84 So. 3d 487 (La. 2012), reached the opposite conclusion regarding its driver's license labeling and is more on point. In so holding, the Louisiana court acknowledged that including the words "sex offender" printed in orange color on an offender's driver's license "may be remotely similar to historical forms of punishment, such as public humiliation, [but] the immediate need for public protection was a corollary of, rather than an addendum to, the punishment for sex offenders." *Smith*, 84 So. 3d at 496 n.7-8, 498. The court then concluded that the requirement of a notation on an offender's driver's license "may be harsh, may impact a sex offender's life in a long-lived and intense manner, and also be quite burdensome to the sex offender, [but] we do not find them to constitute an infringement of the principles of *ex post facto*." 84 So. 3d at 499.

Admittedly, the Louisiana court did not articulate whether it was relying on the federal or state constitution for its holding, but this does not appear to make a difference

56

because that court had previously held Louisiana's Ex Post Facto Clause offers the same protections because it was patterned after the United States Constitution. See *State ex rel. Olvieri v. State*, 779 So. 2d 735 (La. 2001). For this reason, I find the Louisiana decision more persuasive than the Oklahoma decision.

*Quarterly registration*

Next, the majority labels KORA's quarterly, in-person registration requirements for each location where the offender works, lives, or attends school as "a traditional means of punishment" by likening the requirement to probation or parole. Slip op. at 38. It does so without citation to any authority or explanation as to how quarterly reporting mandates offend federal ex post facto caselaw. Again, a review of the unanimous federal caselaw upholding SORNA is persuasive and leads to a contrary conclusion.

SORNA's in-person reporting requirements differentiate between types of sex offenses in determining the frequency of in-person reporting. There must be in-person verification "not less frequently than" once a year for Tier I sex offenders, twice a year for Tier II sex offenders, and four times per year for Tier III sex offenders. 42 U.S.C. § 16916 (2012); see 42 U.S.C. § 16911 (defining Tiers I, II, and III). In *Parks*, the First Circuit recently noted SORNA's in-person requirement was "surely burdensome for those subject to it," but nevertheless concluded this was not punitive, noting:

> "To appear in person to update a registration is doubtless more inconvenient than doing so by telephone, mail or web entry; but it serves the remedial purpose of establishing that the individual is in the vicinity and not in some other jurisdiction where he may not have registered, confirms identity by fingerprints and records the individual's current appearance. Further, the inconvenience is surely minor compared to the disadvantages of the underlying scheme in its consequences for renting housing,

57

obtaining work and the like—consequences that were part of the package that *Smith* itself upheld." 698 F.3d at 6.

See *Doe v. Pataki*, 120 F.3d 1263, 1281-82 (2d Cir. 1997); see also *Doe v. Cuomo*, 755 F.3d 105, 112 (2d Cir. 2014) (approving triennial, in-person reporting as being reasonably related to the nonpunitive, prospective goals of protecting the public and facilitating law enforcement efforts).

Admittedly, KORA's reporting requirements are more burdensome than those in SORNA because under KORA, all sex offenders are subject to in-person registration four times per year, and drug and violent offenders must report in person a minimum of three times per year. K.S.A. 2011 Supp. 22-4905(b). KORA further requires an offender to report registration changes in person "to the . . . agency or *agencies* where last registered." (Emphasis added.) K.S.A. 2011 Supp. 22-4905(a), (g). In addition, the definition of "reside" in KORA is broader than the definition in SORNA. Compare K.S.A. 2011 Supp. 22-4902(j) (definition of "reside") with SORNA's 42 U.S.C. § 16911. Therefore, it is obvious KORA imposes a greater registration burden on the offender than SORNA. But the question is whether the federal courts would view these changes as tipping the balance. I think not.

Consider again as an example *Matso* in which the Ninth Circuit rejected a federal ex post facto challenge to a Nevada law that essentially mirrored SORNA's registration requirements, but also expanded the category of individuals required to register, added to the frequency offenders were subject to registration, and required in-person registration. *Matso*, 670 F.3d at 1051; see also *Litmon*, 768 F.3d at 1242-43 (holding California's 90-day, in-person lifetime registration requirement does not violate federal ex post facto principles); *Hatton*, 356 F.3d at 965 (no evidence California's registration requirement has an objective to shame, ridicule, or stigmatize sex offenders). These decisions strongly

58

point in a direction that indicates KORA's reporting requirements do not offend federal ex post facto principles.

Additionally, the majority's analogy to probation is not persuasive. While probation/parole may have "reporting" in common in the abstract, this is only one aspect of many conditions attached to these punishments. For example, probationers are subject to searches of their persons and property simply on reasonable suspicion of a probation violation or criminal activity and are subject to random drug tests. They may also be required to avoid "injurious or vicious habits" and "persons or places of disreputable or harmful character"; permit state agents to visit their homes; remain in Kansas unless given permission to leave; work "faithfully at suitable employment"; perform community service; go on house arrest; and even serve time in a county jail. K.S.A. 2011 Supp. 21-6607(b), (c).

In sum, I do not believe the federal courts, more specifically the United States Supreme Court, would hold that this historical-form-of-punishment factor weighs toward an ex post facto violation.

AFFIRMATIVE DISABILITY OR RESTRAINT

The majority focuses next on what it characterizes as the "more common restraint on an offender's freedom of movement" under KORA, which is the quarterly registration requirement in each applicable jurisdiction and the required $20 registration fee, as well as the KORA's broader definition of the word "resides." Slip op. at 39. The majority notes the registration costs, depending on circumstances, could be $80 to $240 annually.

But the majority fails to explain how the federal courts would hold that these components of KORA would weigh this factor against the Kansas law. For example, no

evidence was presented establishing that the KORA registration costs were a fine instead of a fee. See *Mueller v. Raemisch*, 740 F.3d 1128, 1134 (7th Cir. 2014) ("The burden of proving that it is a fine is on the plaintiffs . . . .").

In *Mueller*, the Seventh Circuit recently upheld Wisconsin's annual $100 registration fee against a sex offender who moved out-of-state but was still required to register in Wisconsin. In doing so, the court noted first that plaintiff had done nothing to get over the first hurdle by presenting evidence regarding the fee versus the registration program's cost. 740 F.3d at 1134 ("[T]hey cannot get to first base without evidence that it is grossly disproportionate to the annual cost of keeping track of a sex offender registrant—and they have presented no evidence of that either. They haven't even tried."). Similarly, Doe has done nothing as to this evidentiary hurdle, yet the majority strikes this factor against KORA even though the burden is on the challenger and the statute is presumed constitutional.

Second, the Seventh Circuit noted the nonpunitive purpose of collecting fees and where the responsibility lies for having to provide a registry, stating:

> "The state provides a service to the law-abiding public by maintaining a sex offender registry, but there would be no service and hence no expense were there no sex offenders. As they are responsible for the expense, there is nothing punitive about requiring them to defray it." 740 F.3d at 1135.

If it is the potential for a total annual cost of $240 that offends the majority, what is the legal basis for that? The majority leaves this unexplained.

Next, the majority holds that housing and employment problems result from the registry, which ties back to the widespread dissemination of information on the Internet

discussed above, which *Smith* and the other federal courts have plainly rejected. But the majority believes KORA suffers an additional evidentiary blow because of direct evidence that Doe actually lost a job and housing opportunities because of the Internet registry. I disagree this tips the balance when the caselaw is considered.

As noted earlier, my review of federal caselaw from *Smith* on down shows the courts have fully understood that actual consequences result from offender registration and have not dismissed these consequences simply as conjecture. See, *e.g.*, *Smith*, 538 U.S. at 99; *Parks*, 698 F.3d at 6 ("The prospective disadvantages to Parks from such publicity are obvious."). Indeed, several courts have approved state laws that imposed actual residential living restrictions on offenders, which are literally off-limits zones disabling offenders from living in close proximity to schools, playgrounds, etc. See *Doe v. Miller*, 405 F.3d 700 (8th Cir. 2005) (Iowa's 2,000-foot buffer zone regulatory, not punitive); *Salter v. State*, 971 So. 2d 31 (Ala. Civ. App. 2007) (approving 2,000-foot buffer zone); *People v. Leroy*, 357 Ill. App. 3d 530, 828 N.E.2d 769 (2005) (approving 500-foot buffer zone); *State v. Seering*, 701 N.W.2d 655 (Iowa 2005) (upholding 2,000-foot buffer zone); see also *Doe v. Bredesen*, 507 F.3d 998, 1004 (6th Cir. 2007) ("The [Tennessee] Act's registration, reporting, and surveillance components are not of a type that we have traditionally considered as a punishment, and the district court correctly found that they do not constitute an affirmative disability or restraint in light of the legislature's intent."); *Standley v. Town of Woodfin*, 186 N.C. App. 134, 650 S.E.2d 618 (2007) (upholding ban on entering public park); *Doe v. Baker*, No. Civ. A. 1:05-CV-2265, 2006 WL 905368 (N.D. Ga. 2006) (unpublished opinion) (upholding 1,000-foot buffer zone). Clearly, such exclusions cause lost opportunities for housing and employment for offenders, yet these prohibitions were upheld as nonpunitive.

I am not persuaded the federal courts would find KORA to impose requirements traditionally considered to be affirmative disabilities or restraints to the point of weighing this factor against constitutionality.

## TRADITIONAL AIMS OF PUNISHMENT

The third *Mendoza-Martinez* factor is whether the "regulatory scheme . . . promotes the traditional aims of punishment." *Smith*, 538 U.S. at 97. The Court has described those aims as retribution and deterrence. See, *e.g.*, *Mendoza-Martinez*, 372 U.S. at 168.

The majority's analysis of this factor is muddled and difficult to unpack. It is unclear to me whether the majority is relying on the articles attached to Doe's summary judgment motion or its own intuition. As best as I can tell, the majority ultimately ignores the attachments and simply holds that KORA promotes traditional aims of punishment because the legislature increased the reporting term from 10 to 25 years. Slip op. at 41. But this conclusion is at odds with the federal caselaw.

But the fact that KORA has a deterrent effect is not conclusive. The *Smith* Court found that "[a]ny number of government programs might deter crime without imposing punishment" and "'[t]o hold that the mere presence of a deterrent purpose renders such sanctions "criminal" . . . would severely undermine the Government's ability to engage in effective regulation.' [Citations omitted.]" 538 U.S. at 102. The Court also rejected the lower court's finding that Alaska's registration obligations were retributive based upon the length of reporting differing between individuals convicted of nonaggravated offenses and those "convicted of aggravated or multiple offenses." 538 U.S. at 102. The Court found the "categories . . . and the corresponding length of the reporting requirement are

*reasonably related to the danger of recidivism*, and this is *consistent with the regulatory objective*." (Emphasis added.) 538 U.S. at 102.

The *Smith* Court's analysis is equally applicable to KORA, though not wholly dispositive because the Court was addressing a 15-year registration requirement and KORA has a 25-year requirement. But SORNA imposes a 25-year registration requirement on Tier II offenders and a lifetime requirement on Tier III offenders, 42 U.S.C. § 16915 (2012), and the federal courts addressing this issue have upheld SORNA based on *Smith*.

The Eleventh Circuit addressed this registration requirement in *W.B.H.* and held that SORNA is no different than the Alaska act at issue in *Smith*. 664 F.3d at 858-59. The *W.B.H.* court reasoned that SORNA is "reasonably related to the danger of recidivism posed by sex offenders." 664 F.3d at 858. And the court explained that while SORNA "allows the public and law enforcement to determine the general whereabouts of convicted sex offenders, . . . it does not directly restrict their mobility, their employment, or how they spend their time." 664 F.3d at 858. So, the court found that any deterrent effect or purpose of SORNA does not justify a finding that the act's purpose is punitive. 664 F.3d at 858; see also *Under Seal*, 709 F.3d at 265 (quoting from *Smith* to find that SORNA does not promote traditional aims of punishment).

I would find under *Smith* and the cases interpreting SORNA that the traditional aims of punishment factor weighs in favor of KORA being fairly characterized as nonpunitive.

In *Smith*, the Court identified this as "a 'most significant' factor in our determination that the statute's effects are not punitive." 538 U.S. at 102 (citing *United States v. Ursery*, 518 U.S. 267, 290, 116 S. Ct. 2135, 135 L. Ed. 2d 549 [1996]). The *Smith* Court did not elaborate on what is meant by "rational connection to a nonpuntive purpose" before analyzing the Alaska act under the standard. One commentator has noted that the standard is "deferential to the state purpose (much like rational basis review under substantive due process analysis)." Hobson, *Banishing Acts: How Far May States Go to Keep Convicted Sex Offenders Away from Children?*, 40 Ga. L. Rev. 961, 984 (2006). In *State v. Cook*, 286 Kan. 766, 774, 187 P.3d 1283 (2008), this court determined that "the registration act was intended to promote public safety and to protect the public from sex offenders, who constitute a class of criminals that is likely to reoffend."

The majority concludes that arguably under the current version of KORA, "public safety has become a pretext." Slip op. at 42. The majority finds fault with KORA because it does not distinguish between types of offenders and contains no mechanism for relieving a "fully rehabilitated" offender from its notification burdens. But the Ninth Circuit and others have rejected similar arguments. In *Matso*, the court held:

> "Plaintiffs argue *Smith* overstated the risk of sex-offender recidivism. They note that *Smith* cited several studies on sex offender recidivism. *See id.* at 104. Plaintiffs then rely on an expert declaration critiquing the methodology of the recidivism studies in *Smith*. The district court did not make any factual finding regarding the risk of sex offender recidivism. Even had it adopted the declaration's conclusions as its own, a recalibrated assessment of recidivism risk would not refute the legitimate public safety interest in monitoring sex-offender presence in the community." 670 F.3d at 1057.

See also *Bredesen*, 507 F.3d at 1006 (Tennessee Legislature "could rationally conclude that sex offenders present an unusually high risk of recidivism, and that stringent registration, reporting, and electronic surveillance requirements can reduce that risk and thereby protect the public" and concluding that "[w]here there is such a rational connection to a nonpunitive purpose, it is not for the courts to second-guess the state legislature's policy decision"). In addition, the Second Circuit recently held the New York Legislature's "decision to eliminate the possibility of relief from registration for twenty years" for level one offenders did not render the registration provisions punitive. *Cuomo*, 755 F.3d at 112.

The majority fails to cite any authority for its analysis of this factor; and the proposition that offender registration schemes are rationally related to the nonpunitive purpose of public safety finds overwhelming approval in the federal caselaw. Even *Myers*, 260 Kan. at 681, appears to assume offender registration is rationally connected to public safety, and the Alaska state case that held post-*Smith* changes to the Alaska act were an ex post facto violation admits registration, at least as to sex offenders, advances a nonpunitive public safety purpose. See *Doe v. State*, 189 P.3d 999, 1015-16 (Alaska 2008).

I do not see how the majority can say no public safety purpose is rationally furthered by having sex, drug, and violent offenders register. I would follow the referenced precedent and hold that KORA has a rational connection to a nonpunitive purpose, so this factor does not weight towards punishment.

EXCESSIVE IN RELATION TO REGULATORY PURPOSE

In *Smith,* the Court clarified that "[t]he excessiveness inquiry of our ex post facto jurisprudence is not an exercise in determining whether the legislature has made the best

choice possible to address the problem it seeks to remedy. The question is whether the regulatory means chosen are reasonable in light of the nonpunitive objective." 538 U.S. at 105. The *Smith* Court further noted that ex post facto jurisprudence does not preclude a state from making reasonable categorical judgments that certain crimes should have particular regulatory consequence.

Instead of independently analyzing this factor, the majority merely harkens back to the ground it already plowed, concluding: "Our discussion of the other factors has touched upon the excessive nature of KORA." Slip op. at 43. The majority then specifically cites the fact that the 2011 KORA amendments required more information from the offenders and that the penalty for noncompliance has increased. Slip op. at 43. I would hold that neither of these requirements is excessive given KORA's public safety purpose based on the authority cited above.

CONCLUSION

Although the 2011 KORA offender registration scheme imposes a number of burdens on sex offenders, I believe the applicable federal caselaw considering similar burdens under other offender registration schemes compels us to conclude that the 2011 KORA amendments do not violate the United States Constitution's Ex Post Facto Clause as applied to sex offenders and that the United States Supreme Court would so hold.

NUSS, C.J., and LUCKERT, J., join in the foregoing concurring and dissenting opinion.