Johnson, J.,
dissenting: I dissent from the majority’s decision in this case and from the majority’s declaration that it is overruling the decisions in State v. Redmond, 304 Kan. 283, 371 P.3d 900 (2016), State v. Buser, 304 Kan. 181, 371 P.3d 886 (2016), and Doe v. Thompson, 304 Kan. 291, 373 P.3d 750 (2016), which I will hereafter collectively refer to as “Ex Post Facto cases.”
The majority does not explain the unusual circumstance whereby the opinions in the September 2014 Ex Post Facto cases are being filed on the same day as the opinion in this September 2015 case that purports to overrule their holdings. I firmly believe that some explanation is warranted in the interests of clarity and transparency. Moreover, I want to assure that the defendants in the Ex Post Facto cases obtain the relief to which they are entitled.
The “overruled” Ex Post Facto cases dealt with the question of whether article I, § 10 of the United States Constitution — the Ex Post Facto Clause — -prohibited the retroactive application of the 2011 amendments to the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 et seq. An initial consideration was whether KORA was even subject to the Ex Post Facto Clause. The three cases were set together and heard on this court’s docket on September 11, 2014.
At that time, and for some 3 months thereafter, a position on this court was open due to the appointment of our colleague, Nancy Moritz, to the United States 10th Circuit Court of Appeals. Consequently, the Chief Justice utilized his constitutional and/or statutory authority to assign a senior district court judge as the seventh member of this court to hear and decide cases coming before the court during the vacancy period, which included the September 2014 docket. See K.S.A. 20-2616(b) (“A retired justice or judge so designated and assigned to perform judicial service or duties shall *212 have the power and authority to hear and determine all matters covered by the assignment.”); see also Kan. Const, art. 3, § 6(f) (“The supreme court may assign a district court judge to serve temporarily on the supreme court.”). Notably, our constitution does not restrict or limit the power and authority of a temporarily assigned justice nor does it restrict or limit the precedential effect of the decisions issued by a supreme court that includes a justice that is temporarily assigned. Indeed, the Chief Justice often announces at oral argument drat a temporarily assigned jurist will be fully participating in die decision of the court.
As evidenced by the opinions that are now being publicly filed, a majority of the constitutionally constituted court hearing die Ex Post Facto cases voted to hold diat KORAs statutory scheme, after the 2011 amendments, was so punitive in effect as to negate any implied legislative intent to deem it civil, so that it was subject to the Ex Post Facto Clause’s prohibition on retroactive application. The decision specifically left intact all provisions of the 2011 iteration of KORA for any person who committed a qualifying offense after July 1, 2011, the effective date of the 2011 amendments. In other words, the majority opinion in the Ex Post Facto cases did not hold KORA unconstitutional, but rather it held that the retroactive application of KORAs amendments was unconstitutional. The prohibitions against cruel and/or unusual punishment in our federal and state constitutions were neither raised as issues nor discussed by this court in the Ex Post Facto cases.
By August 2015, the opinion in Thompson, the lead Ex Post Fac-to case, was ready to be filed with the Cleric of the Appellate Court. By that time, the vacancy on this court had been filled and this case had been set on a docket to be heard by the newly constituted court the following month, September 16, 2015, i.e., a year after the arguments in Thompson. Thereupon, notwithstanding that the outcome for the Ex Post Facto litigants would be unaffected by any subsequent ruling in another case, a majority of the Ex Post Facto court ordered that the opinions in those cases were to be held in abeyance pending the newly constituted court s hearing and resolution of Petersen-Beard s cruel and unusual punishment case.
Then, after a majority of the court in this case determined that *213 it could overrule the holdings in the Ex Post Facto cases for all future litigants — as disclosed in the majority opinion above — a majority of the Ex Post Facto court ordered that the release of the Ex Post Facto cases was to be further delayed until this Petersen-Beard opinion was ready to be filed. The apparent rationale for the delay was to make the holding in the Ex Post Facto cases applicable solely to the parties in those cases.
To be clear, this Petersen-Beard opinion does not change the result for the Ex Post Facto defendants, i.e., John Doe in Doe v. Thompson, 304 Kan. at 291; Joseph M. Buser in State v. Buser, 304 Kan. 181; and Promise Delon Redmond in State v. Redmond, 304 Kan at 283. Likewise, Leonard D. Charles, in State v. Charles, 304 Kan. 158, 372 P.3d 1109 (2016), whose case was heard on the same docket as the Ex Post Facto cases, will be governed by the holding in his case. Plainly stated, all of those litigants won on appeal, and the KORA amendments cannot be applied to them. But they had to wait for many months — unnecessarily in my view — to reap the benefits of their respective wins. I find that to be a denial of justice.
Turning to the merits of this case, I begin by clarifying what is before us to be decided. The issue presented here was whether the KORA provision requiring Petersen-Beard to register as a sex offender for the rest of his life was unconstitutionally cruel and unusual punishment under the Eighth Amendment to the United States Constitution or unconstitutionally cruel or unusual punishment under § 9 of the Kansas Constitution Bill of Rights. The Ex Post Facto Clause of article I, § 10 of the United States Constitution was not in play here. Moreover, the issue is not limited to retroactivity, but rather Petersen-Beard seeks to nullify KORA’s lifetime registration provision for all offenders, both past and future. In other words, the issue in this case is not the same issue presented in the cases it purports to overrule, notwithstanding the possibility that the analyses might overlap in some respects.
Further, the question of whether KORA is subject to the cruel and unusual constraint of the Eighth Amendment to the United States Constitution was not presented to or decided in the Ex Post Facto cases. Consequently, the majority’s assertion that its determination that KORA is not punitive for Eighth Amendment purposes *214 requires the reversal of the prior Ex Post Facto cases is dictum. See Law v. Law Company Building Assocs., 295 Kan. 551, 564, 289 P.3d 1066 (2012) (nobody bound by dictum, not even the court that issued it). If this case is to provide authority for the proposition that the Ex Post Facto Clause does not apply to KORA because the act is nonpunitive for both Eighth Amendment and Ex Post Facto purposes, then a subsequent case that presents that precise issue can make that determination. Accordingly, the litigants of that subsequent case could challenge the applicability of the federal circuit courts of appeal cases addressing the constitutionality of the Sex Offender Registration and Notification Act (SORNA), 42 U.S.C. § 16901 et seq. (2012), upon which the majority in this case relies to conflate the two types of cases.
Likewise, the Thompson dissent, adopted as the majority’s rationale, presents string cites to federal circuit courts of appeal decisions that analyze the constitutionality of SORNA or other states’ registration acts in fight of those federal circuit courts’ mandatory authority from the United States Supreme Court. While perhaps interesting, those citations are only tangentially connected to the issue before this court. Our task, as the Kansas Supreme Court, is to rule on the constitutionality of the Kansas registration act. A federal court’s determination that a federal act is constitutional might be used as an analog to inform a state court’s decision on its own laws, but state courts are not bound by any lower federal court decision, even on matters of federal constitutional law. As stated by a member of the United States Supreme Court:
“The Supremacy Clause demands that state law yield to federal law, but neither federal supremacy nor any other principle of federal law requires that a state court’s interpretation of federal law give way to a (lower) federal court’s interpretation. In our federal system, a state trial court’s interpretation of federal law is no less authoritative than that of the federal court of appeals in whose circuit the trial court is located.” Lockhart v. Fretwell, 506 U.S. 364, 376, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993) (Thomas, J., concurring).
Ordinarily, any analysis of a Kansas legislative act would not begin with a consideration of merely persuasive federal authority when there are decisions of this court on point. If there is direct authority in tins State, it is binding on the lower State courts and is *215 entitled to the benefit of the doctrine of stare decisis in this court. In Thompson, the majority opinion began its analysis by discussing the direct authority of State v. Myers, 260 Kan. 669, 699, 923 P.2d 1024 (1996), cert. denied 521 U.S. 1118 (1997), which held that the disclosure provisions of a prior registration law — the Kansas Sex Offender Registration Act (KSORA) — were punitive in effect, precluding their retroactive application under the Ex Post Facto Clause. The State in Thompson had argued that Myers was overruled by the United States Supreme Courts decision in Smith v. Doe, 538 U.S. 84, 103-04, 123 S. Ct. 1140, 155 L. Ed. 2d 164 (2003). But that was not accurate, because Smith did not review the Myers decision and did not even consider the Kansas registration act. Rather, the Smith court held that the Alaska Sex Offender Registration Act (ASORA) was nonpunitive and not subject to the Ex Post Facto Clause. Accordingly, Smith is important only as a guide as to how the United States Supreme Court might view KORA for federal constitutional purposes; it is not direct, mandatory authority that KORA is nonpunitive.
The Thompson dissent obliquely recognized that Smith was not directly binding in that Ex Post Facto case when it stated that “the real question presented” was: “Are there convincing reasons to believe the United States Supreme Court would view KORA differently than it viewed the Alaska law in 2003 when it decided Smith?” Thompson, 304 Kan. at 332. (Biles, J., concurring in part and dissenting in part). Of course, the majority’s recitation of that issue statement presents an incomplete picture in Peterson-Beard s case because of the State constitutional provision in play here. The United States Supreme Court does not have authority to interpret § 9 of the Kansas Constitution Bill of Rights. It is this courts view of KORA that will decide that issue, even if this court chooses to adopt a rationale consistent with the Smith majority. The majority must own that decision; it cannot hide behind federal decisions.
Setting aside for a moment the State constitutional question, the answer to the question posed by the Thompson dissent is yes, there are convincing reasons to believe that the United States Supreme Court, in 2016, would view the current version of KORA differently than it viewed ASORA in 2003, when it decided Smith. *216 The majority in Thompson attempted to explain those reasons, and I will reiterate some of them here, albeit I do not intend to clip and paste the entire majority opinion into this dissent. In addition, I will present some points that were not explicitly made in Thompson.
March 5, 2016, marked 13 years since Smith was decided, and there are new justices now. Five of the justices involved in the Smith decision, i.e., 55.56% of the Court, are no longer on the Court. Three of the five justices (60%) joining the majority opinion in Smith, upon which the Thompson dissent heavily relies, are no longer on the Court. Surely, the majority here, especially die Thompson dissenters, can appreciate the impact of a change in Court composition.
And not only are the new justices different, but they are younger, which might well make them more attuned to the digital age. For instance, the youngest member of the current court was about 21 years old when IBM introduced the PC (personal computer) in 1981, as compared to Chief Justice Rehnquist — a member of the Smith majority — who was approaching 60 years old when the personal computer revolution began to go mainstream. The Smith majority, authored by Justice Kennedy, who was 67 years old at the time, described Alaska’s posting of registration information on the Internet as a passive system, akin to physically visiting “an official archive of criminal records,” 538 U.S. at 99.
In contrast, in Riley v. California, 573 U.S. _, 134 S. Ct. 2473, 2491, 189 L. Ed. 2d 430 (2014), a majority of the 2013 Term Supreme Court noted that ordinary citizens with smartphones can easily access vast amounts of data and that “a cell phone [can be] used to access data located elsewhere, at the tap of a screen.” 573 U.S. at _, 134 S. Ct. at 2491. That data includes push notifications of sex offender registries and indiscriminate sharing of social media. Certainly, if nothing else, a majority of the Court must now recognize that ubiquitous tweeting and other social media have changed the landscape of information sharing. Pointedly, Twitter did not exist until 3 years after Smith was decided. In short, I believe a majority of the current Supreme Court would be more attuned to the repercussions of Internet dissemination of a sex offender registry.
*217 In this State, Myers displayed a great deal of prescience. It held that despite how one might try to justify the disclosure provisions of KSORA, the repercussions visited upon Myers were “great enough ... to be considered punishment. The unrestricted public access given to the sex offender registry is excessive and goes beyond that necessary to promote public safety.” 260 Kan. at 699. Myers fretted that “[t]he print or broadcast media could make it a practice of publishing the list [of sex offenders] as often as they chose.” 260 Kan. at 697. Not only has that circumstance come to pass, but the unnecessary digital distribution of the sex offender registry has gone far beyond that imagined by the Myers court. In other words, the punitive effect on offenders is even greater now.
The explanation that the repercussions to which Myers referred arise from the fact that the offender was convicted in a public proceeding and the records of that conviction are public information is nonsensical. The whole purpose of the registry is to provide easy access to information that most people would not know. It is the wide dissemination of the information that causes the punitive effect. Moreover, the public record of conviction does not provide the wealth of current information about the offender that he or she must provide for the sex offender registry and keep updated. Public shaming is much more effective if the public knows where the offender lives, works, and/or attends school, as well as the make, model, and license number of the vehicle he or she drives.
Likewise, the attempted rationale that an Internet-based registry is merely the dissemination of accurate information is unpersuasive. An example of traditional public shaming referred to in Myers came from Nathaniel Hawthorne’s The Scarlet Letter (Random House 1950) (1850), in which Hester Prynne’s punishment for adultery required her to wear a scarlet “A” upon her dress. One could describe the information being conveyed by that scarlet letter as “accurate information.” Yet, Hawthorne described its punitive effect as follows: “‘There can be no outrage . . . against our common nature, — whatever be the delinquencies of the individual, — no outrage more flagrant than to forbid the culprit to hide his face for shame; as it was the essence of this punishment to do.’” Artway v. Attorney General of State of N.J., 81 F.3d 1235, 1265 *218 (3d Cir. 1996) (quoting The Scarlet Letter, 63-64). Further, one has to challenge the accuracy of the disseminated information when it does not differentiate between the extremely low-risk offenders and the extremely dangerous high-risk offenders. Ultimately, however, the point is that, despite the spin the majority would put on it, todays dissemination of sex offender registiy information does resemble traditional forms of punishment.
In Thompson, we set forth KORAs onerous requirements and differentiated them from both Smith’s ASORA and the dissents SORNA. It is unfathomable to me that any rational person could say with a straight face that being forced to comply with those Draconian terms and conditions of registration for the rest of ones life, under penalty of going to prison for a new felony, is not an affirmative disability or restraint on the offender. The majority quibbles over whether the required monetary payments due eacb quarterly reporting date is a fine or fee. But Smith described the intent-effects test as being in two parts, whereby the second step examines the “punitive .. . purpose or effect.” 538 U.S. at 92. I submit that a substantial fee, even if its intent is to cover the government s cost of the registiy, can have a punitive effect on the offender who might be living hand-to-mouth because of problems getting and maintaining employment.
Moreover, although the majority compares individual provisions of KORA to corresponding provisions in SORNA, in the Thompson majority we cautioned that
“it is important to keep in mind that it is the entire ‘statutory scheme’ that must be examined for its punitive effect. See Smith, 538 U.S. at 92 (effects analysis requires the appellate court to ‘examine . . . the statutory scheme’ [emphasis added]); Myers, 260 Kan. at 681 (quoting United States v. Ward, 448 U.S. 242, 248-49, 100 S. Ct. 2636, 65 L. Ed. 2d 742 [1980]) (‘ask whether the “statutory scheme was so punitive either in purpose or effect’” [emphasis added]). For instance, a particular registration requirement may not have the same punitive effect in a statutory scheme that permits a reduction in registration time for proven rehabilitation, as it does in a statutory scheme that precludes any individualized modifications.” Thompson, 304 Kan. at 320.
That distinction is particularly compelling when considering that SORNA allows an offender the opportunity to reduce his or her registration time, whereas under KORA there is no opportunity for *219 relief from lifetime registration even for a completely rehabilitated offender. The punitive effect of being required to register in person quarterly might be mitigated if the requirement could be terminated when it was no longer necessary, rather than mandatorily continuing for a lifetime.
Perhaps the most compelling reason for the current Supreme Court to view KORA differently than the Smith Court viewed ASORA involves the last two factors discussed by the majority: whether the statutory scheme is rationally connected to a nonpu-nitive purpose; and whether the statutory scheme is excessive in relation to the identified nonpunitive purpose.
Smith analyzed ASORA against the nonpunitive purpose of public safety. The Court opined that a registration act need not be “‘narrowly drawn to accomplish the stated purpose/” so long as “the Act’s nonpunitive purpose is [not] a ‘sham or mere pretext.’ Hendricks, 521 U.S., at 371 (Kennedy, J., concurring).” Smith, 538 U.S. at 103. Smith then determined that “Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism.” 538 U.S. at 103. The Smith majority then supported that ruling as follows:
“The risk of recidivism posed by sex offenders is ‘frightening and high.’ McKune v. Lile, 536 U.S. 24, 34[, 122 S. Ct. 2017, 153 L. Ed. 2d 47] (2002), see also id., at 33 (“When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault’ (citing U.S. Dept. of Justice, Bureau of Justice Statistics, Sex Offenses and Offenders 27 (1997); U.S. Dept. of Justice, Bureau of Justice Statistics, Recidivism of Prisoners Released in 1983, p. 6 (1997))).” 538 U.S. at 103.
The Court then determined that “[t]he duration of the reporting requirements is not excessive,” because research on child molesters had shown drat most of them do not reoffend within the first several years after release, but rather a reoffense may occur “ ‘as late as 20 years following release.’ National Institute of Justice, R. Prentky, R. Knight, & A. Lee, U.S. Dept, of Justice, Child Sexual Molestation: Research Issues 14 (1997).” 538 U.S. at 104. But a recent investigation into the source of Smith’s seemingly compelling statistics calls into question their bona lides.
In “Frightening and High”: The Supreme Court’s Crucial Mistake About Sex Crime Statistics, 30 Const. Comment. 495 (2015), *220 the authors Ira and Tara Ellman point out that Justice Kennedy, the author of the Smith majority, was also the author of a four-person plurality decision in McKune, which is Smith’s cited source for the “frightening and high” statistic. In McKune, Justice Kennedy wrote that the recidivism rate of untreated sex offenders “ ‘has been estimated to be as high as 80%,’ ” which he later referred to as “‘a frightening and high risk of recidivism.’” 30 Const. Comment. at 495-96 (quoting McKune, 536 U.S. at 33-34). The source of the 80% statement — apparently taken from a reference in an amicus brief filed by the Solicitor General — was cited as the U.S. Dept, of Justice, Nat. Institute of Corrections, A Practitioner’s Guide to Treating the Incarcerated Male Sex Offender, xiii (1988). Although that Practitioner s Guide was published by the Justice Department, its “Preface notes that its contents present the views ‘of the authors and do[es] not necessarily represent the official position or policies of the U.S. Department of Justice.’” 30 Const. Comment. at 498 n.11. The Practitioner’s Guide cited a 1986 article in Psychology Today as the source of its claim. That mass-marketed magazine article- — designed for a lay audience — contained the following bare assertion, without attribution or supporting reference: “ ‘Most untreated sex offenders released from prison go on to commit more offenses — indeed, as many as 80% do.’” 30 Const. Comment, at 498 (quoting Freeman-Longo & Wall, Changing a Lifetime of Sexual Crime, Psychology Today, March 1986, at 64). The author of the magazine article was a counselor who was touting his prison counseling program for sex offenders and whose “unsupported assertion about the recidivism rate for untreated sex offenders was offered to contrast with [the counselor’s] equally unsupported assertion about the lower recidivism rate for those who complete [the counselor’s] program.” 30 Const. Comment. at 498.
The article did not stop at challenging the factual support for McKune’s “frightening and high” finding. It cited to studies utilizing accepted methodologies to support the proposition that the purported 80% risk of reoffending was way off base, both as a stand-alone statistic for sex offenders and as a comparison to other offenders. “One recent study found that about 3% of felons with no known history of sex offenses commit one within 4.5 years of *221 their release,” whereas “[a]bout 97.5% of the low-risk offenders were offense-free after five years.” 30 Const. Comment. at 502-04. In other words, the risk of recidivism within 5 years of release from prison for a low-risk sex offender (about 2.5%) is virtually identical to that of a released prisoner who was not convicted of a sex offense (about 3.0%).
Further, the sample group of the study Smith used to declare that reoffenses do not occur within the first several years of release, but rather “may occur ‘as late as 20 years following release,’ ” 538 U.S. at 104, consisted of “rapists and child molesters released from the Massachusetts Treatment Center for Sexually Dangerous Persons, established in 1959 ‘for the purpose of evaluating and treating individuals convicted of repetitive and/or aggressive sexual offenses.’” 30 Const. Comment. at 503 n.29 (citing Prentky, Lee, Knight, & Cerce, Recidivism Rates Among Child Molesters and Rapists: A Methodological Analysis, 21 L. & Hum. Behav. 635, 637 [1997]). While the public might assume that everyone on the sex registry is a forcible rapist or molester of young children, that is simply not the reality, as evidenced by the facts of this case. But even for the offenders initially assessed as high-risk, the likelihood of reoffend-ing decreases over time. “Those who haven’t re-offended after fifteen years are not high-risk for doing so, regardless of their offense or their initial risk assessment.” 30 Const. Comment. at 503.
The article recognized that human nature is such that, when faced with an immeasurable fear and strongly held belief, a person will tend to ignore or discount quantifiable facts. -“The label ‘sex offender’ triggers fear, and disgust as well. Both responses breed beliefs that do not yield easily to facts.” 30 Const. Comment. at 508. Yet, I must cling to the belief that the persons who have been privileged to serve on our nation’s highest Court will yield to the facts and give a closer look at whether our statutory scheme is rationally connected to the nonpunitive purpose of public safety and whether its terms and conditions are excessive in relation to that public safety purpose. If they do, I submit that an objective analysis will disclose that, in the current version of KORA, public safety has crossed over the line and is now a “sham or mete pretext” for imposing additional punishment on the offender.
*222 The Thompson majority pointed out that KORA does not differentiate between the young immature adult whose indiscretion with a consenting and encouraging teenager has led to a qualifying conviction and the middle-aged confirmed and incorrigible rapist and pedophile. We said that mixing in low-or-no-risk offenders with the high-risk offenders created an overinclusive system where “[t]oo much [was] too little.” Thompson, 304 Kan. at 326. In other words, “[i]f the registry’s main purpose is to let us monitor and warn people about those who committed violent, coercive, or exploitative contact sex offenses, we dilute its potential usefulness when we fill it up with people who never did any of those things.” 30 Const. Comment. at 504.
We also pointed out in the Thompson majority that KORAs statutory scheme was also too underinclusive to be rationally related to the nonpunitive purpose of public safety. Thompson, 304 Kan. at 326. For the registry to provide effective public safety, it should notify the public of all persons known to have committed acts considered to be sex offenses. Yet, only persons convicted of a qualifying crime are required to register.
It is not uncommon for a prosecutor to entice a plea agreement from a defendant charged with a registration-qualifying sex offense by offering to amend the charge to a crime that will not require the defendant to register. Certainly, that circumstance dilutes the States argument that nullifying KORA in any respect will leave the young children of this State defenseless — the State effects the same result through a plea agreement. But more importantly for our purposes]'one would think that, if the legislatures true intended purpose for the registry was public safety, it would have prohibited prosecutors and courts from circumventing the public’s safety through a plea bargain. The legislature has demonstrated that it knows how to do drat for driving under the influence (DUI): “No plea bargaining agreement shall be entered into nor shall any judge approve a plea bargaining agreement entered into for the purpose of permitting a person charged with [DUI].... to avoid the mandatory penalties established by this section . . . .” K.S.A. 2015 Supp. 8-1567(m).
Likewise, the registry would not include a person who has com *223 mitted a qualifying sex offense but who avoided being convicted of the crime on some legal basis. For instance, an acquittal could follow the court’s suppression of illegally obtained evidence. While the exclusionary rule will entice proper police conduct in the future, the exclusion of the sex offender from the registry does not further its purpose of public safety. In another area deemed to be a civil regulatory statutory scheme, the Sexually Violent Predator Act, K.S.A. 2015 Supp. 59-29a01 et seq., the legislature made a provision for the civil commitment of a qualifying person, even where that person was deemed incompetent to stand trial in his or her criminal case. K.S.A. 2015 Supp. 59-29a07(g). No similar procedure is in place under KORA, further rendering its public safety purpose suspect.
Given the foregoing, together with the other points made in the Thompson majority, I have every confidence that the United States Supreme Court would find that the current “statutory scheme [of KORA] ‘ “is so punitive either in purpose or effect as to negate [the States] intention” to deem it “civil.”’” See Smith, 538 U.S. at 92. Accordingly, even under the issue framed by the Thompson dissent and adopted by the majority here, Petersen-Beard should prevail.
But even though that was the end of the analysis in Thompson, we have more to discuss in this case. The Kansas Constitution was not involved in Redmond, Buser, or Thompson, because our state constitution does not contain an ex post facto provision. It is involved here, however, because, in addition to the Eighth Amendment’s prohibition against cruel and unusual punishment, our own constitution — in § 9 of the Kansas Constitution Bill of Rights— prohibits “cruel or unusual punishment.” The majority recognizes that this court can independently interpret our own State constitution in a manner that extends greater protection to our Kansas citizens than the United States Supreme Court has provided under its interpretation of the United States Constitution. Then, it dismisses that proposition with the superficial rationale that “we generally have not done so” and “[w]e can find no . . . reason to depart from our general practice.” 304 Kan. at 209-11.
I will not prolong this dissent with a discussion of the historical development of this court s practice of simply adopting federal con *224 stitutional interpretation for similar State constitutional provisions, or my opposition to such a practice. Suffice it to say that it has not always been that way. See Monnat & Nichols, The Loneliness of the Kansas Constitution, 34 J. Kan. Ass’n Just. 10, 11 (September 2010) (“In its early opinions, the Kansas Supreme Court routinely interpreted the Kansas constitution as an independent document with force of its own.”).
More importantly, even if we adopt the federal analytical model, we need not apply it to Kansas’ statute in the same manner as the United States Supreme Court applied it to Alaska’s statute. Indeed, after Smith, the Alaska Supreme Court considered the same statute in the same case with the same defendants, utilizing the same intent-effects test and Mendoza-Martinez factors to determine the same ex post facto issue, albeit under the Alaska state constitution. The state court found that its statute, ASORA, violated the Ex Post Facto Clause of the Alaska state constitution, concluding:
“Because ASORA compels (under threat of conviction) intrusive affirmative conduct, because this conduct is equivalent to that required by criminal judgments, because ASORA makes the disclosed information public and requires its broad dissemination without limitation, because ASORA applies only to those convicted of crime, and because ASORA neither meaningfully distinguishes between classes of sex offenses on the basis of risk nor gives offenders any opportunity to demonstrate their lack of risk, ASORA’s effects are punitive. We therefore conclude that the statute violates Alaska’s ex post facto clause.” Doe v. State, 189 P.3d 999, 1019 (Alaska 2008).
In the Thompson majority, we found it interesting that the Alaska court had cited with approval to Myers, even after the Smith decision. See Doe, 189 P.3d at 1017. We also noted that other states have found their sex offender registration statutes constrained by their state constitutions. See, e.g., Wallace v. State, 905 N.E.2d 371, 377-78 (Ind. 2009); Doe v. Dept. of Public Safety and Correctional Services, 430 Md. 535, 547-48, 62 A.3d 123 (2013); State v. Williams, 129 Ohio St. 3d 344, 347-49, 952 N.E.2d 1108 (2011); Starkey v. Oklahoma Dept. of Corrections, 2013 OK 43, ¶¶ 76-79, 305 P.3d 1004 (2013).
In short, even if we were not convinced that the United States Supreme Court would find KORA punitive, we can and should still find that it is so punitive in effect as to negate any pretended civil *225 regulatory purpose under our State constitution. The citizens of this State are entitled to have their own Supreme Court interpret their own constitution in a logical, rational manner that is consistent with actual, not made-up, facts. Consequently, I would find that this matter should proceed to a determination of the cruel or unusual analysis.
* * *
Beier and Rosen, JJ., join Justice Johnson's dissent as to the result.
See Doe v. Thompson, 304 Kan. 291, 373 P.3d 750 (2016); State v. Buser, 304 Kan. 181, 373 P.3d 886 (2016); State v. Redmond, 304 Kan. 283, 371 P.3d 900 (2016); see also State v. Charles, 304 Kan. 158, 372 P.3d 1109 (2016) (following Doe, Buser, Redmond; imposition of registration requirement for violent offender qualifies as punishment, entitling defendant to relief under Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 [2000]).